**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

THE FOURTH CORNER CREDIT UNION,
a Colorado state-chartered credit union,

                    Plaintiff,

v.

NATIONAL CREDIT UNION ADMINISTRATION,

                    Defendant.

---

**COMPLAINT**

---

Plaintiff, complaining of Defendant herein, would respectfully show this Honorable Court as follows:

## NATURE OF PROCEEDINGS

1.     This case involves the rejection by the Director of the National Credit Union Administration's Office of Consumer Protection of the application of The Fourth Corner Credit Union, a Colorado state-chartered credit union, for federal share deposit insurance.   Plaintiff's complaint seeks a judicial review of the agency's action pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq*., due process in accordance with the Fifth Amendment of the Constitution, and declaratory judgment pursuant to 28 U.S.C. §2201.

## THE PARTIES

2.     Plaintiff, The Fourth Corner Credit Union ("TFCCU"), is a Colorado state-chartered credit union; it was granted Charter No. 272 on November 19, 2014; it is a nonprofit corporation formed and registered on said date; its principal place of business is located in the City and County of Denver; it was incorporated pursuant to the applicable provisions of the Colorado Revised Statutes; said credit union exists, is in good standing, and is authorized to conduct business pursuant to all of the powers conferred upon it by law; it is currently regulated and supervised solely by the Colorado Division of Financial Services ("DFS").   Consistent with its state credit union charter, TFCCU intends to provide banking services to compliant state licensed cannabis and hemp businesses, their employees, industry vendors and businesses and/or persons that are members of, or who join, one of the non-profit associations designated to be within TFCCU's multiple

association common bond field of membership established in TFCCU's Articles and Bylaws.

3.      Defendant, National Credit Union Administration ("NCUA"), is an independent executive agency managed by a three-member board, appointed by the President, by and with the advice and consent of the Senate.  12 U.S.C. §1752a.

## JURISDICTION AND VENUE

4.      This Court has subject-matter jurisdiction over this action pursuant to the following statutes: (a) 28 U.S.C. §1331, providing for "original jurisdiction of all civil actions arising under the Constitution, laws or treaties of the United States"; (b) 28 U.S.C. §1367, providing for "supplemental jurisdiction over all other claims that are so related to claims within such original jurisdiction that they form part of the same case or controversy"; (c) 28 U.S.C. §2201, providing for a declaration of rights and other legal relations of any interested party in a case of actual controversy within its jurisdiction; and (d) 5 U.S.C. §702, providing for judicial review of final agency action.

5.      Venue is proper in this judicial district, pursuant to 28 U.S.C. §1391(e)(2) and (3), in that a substantial part of the events giving rise to the claim occurred in this district and plaintiff resides in this district.

6.      The agency action in respect of which judicial review is sought is a decision evidenced by a letter from Gail W. Laster, Director of the NCUA Office of Consumer Protection dated July 2, 2015, declared by Ms. Laster to constitute a "final agency decision reviewable pursuant to the Administrative Procedure Act, 5 U.S.C. §701 *et seq.*"

## FACTUAL ALLEGATIONS

**General Background**.

7.      On January 10, 2014, United States Senators Michael Bennet (D-CO) and Mark Udall (D-CO) and Members of Congress Dianna DeGette (D-CO), Ed Perlmutter (D-CO), Mike Coffman (R-CO) and Jared Polis (D-CO) (the "Colorado Delegation") wrote Jennifer Shasky Calvery, Director, Financial Crimes Enforcement Network ("FinCEN"), United States Department of the Treasury and Deputy Attorney General James Cole, United States Department of Justice ("DOJ").   The letter requested that FinCEN and DOJ:

> … expedite guidance that would enable licensed marijuana dispensaries and retail stores in Colorado to avail themselves of the banking system . . . There has been significant uncertainty, however, as to whether these businesses will be able to accept checks or credit cards or to open accounts at insured depository institutions.  The possibility of a cash-only system has raised significant public safety concerns for customers and employees who must now handle and transport large quantities of cash.  Additionally, a cash-only system may make it more difficult for the state and federal government to regulate and audit these facilities.  Finally, without access to the banking system, it may become easier for retail stores to avoid sales tax collections, which would diminish funding for marijuana enforcement activities and Colorado school construction.

8.      On February 14, 2014, in response to the letter from the Colorado Delegation, and prompting from others that shared similar public safety concerns, the Department of Treasury, Financial Crimes Enforcement Network ("FinCEN"), issued formal federal guidance, FIN-2014-G001, entitled "BSA Expectations Regarding Marijuana-Related Businesses" (the "FinCEN guidance") and James M. Cole, Deputy Attorney General, United States Department of Justice ("DOJ"), issued a "Memorandum for All United States Attorneys:   Guidance Regarding Marijuana Related Financial Crimes" (the "Cole memorandum").

9.     FinCEN states that their guidance:

clarifies how financial institutions can provide services to marijuana-related businesses ("MRBs") consistent with their Bank Secrecy Act ("BSA") obligations, and aligns the information provided by financial institutions in BSA reports with federal and state law enforcement priorities. This FinCEN guidance should [was intended to] enhance the availability of financial services for, and the financial transparency of, marijuana-related businesses. *Id. FIN-2014-G001 at Page 1.*

10.     The FinCEN guidance was intended to facilitate state licensed marijuana-related business "… access to financial services, while ensuring that this activity is transparent and the funds are going to regulated financial institutions responsible for implementing appropriate AML safeguards."[1] The "overarching goal" in issuing the guidance "… was to promote financial transparency, ensuring law enforcement receives the reporting from financial institutions that it needs to police this activity and making it less likely that the financial operations move underground and become more difficult to track."[2]

11.     The Cole memorandum instructed DOJ attorneys and law enforcement to focus on "eight priorities in enforcing the Controlled Substances Act ("CSA") against marijuana-related conduct." [3] The Cole memorandum stated that it is the federal expectation that states and local governments that have enacted laws authorizing

---

[1] Remarks of Jennifer Shasky Calvery, Director, Financial Crimes Enforcement Network, 2014 Mid-Atlantic AML Conference, Washington, DC, August 12, 2014, Page 5.

[2] *Id.* at Page 4.

[3] The eight priorities in enforcing the CSA against marijuana-related conduct are: (1) preventing the distribution of marijuana to minors; (2) preventing revenue from the sale of marijuana from going to criminal enterprises, gangs, and cartels; (3) preventing the diversion of marijuana from states where it is legal under state law in some form to other states; (4) preventing state-authorized marijuana activity from being used as a cover or pretext for the trafficking of other illegal drugs or other illegal activity; (5) preventing violence and the use of firearms in the cultivation and distribution of marijuana; (6) preventing drugged driving and the exacerbation of other adverse public health consequences associated with marijuana use; (7) preventing the growing of marijuana on public lands and the attendant public safety and environmental dangers posed by marijuana production on public lands; and (8) preventing marijuana possession or use on federal property. An additional requirement mentioned in FinCEN's guidance is that MRBs must be compliant with applicable state and municipal cannabis licensing and regulatory law.

marijuana-related conduct will implement strong and effective regulatory and enforcement systems to address the risks related to the legalized marijuana industry. FinCEN's guidance to financial institutions adopted the Cole memorandum's eight priorities of federal criminal prosecutorial activity as the areas requiring enhanced due diligence and awareness in "knowing-your-customer," if a bank customer or credit union member is an MRB.

12.     The Colorado Bankers Association ("CBA") took the position that the fact that FinCEN's guidance and the Cole memorandum intended to give banks federal permission to open accounts for state licensed marijuana businesses "only reinforces and reiterates that banks can be prosecuted for providing accounts to marijuana related businesses."   CBA's press release stated:  "After a series of red lights, we expected the guidance to be a yellow one.  This isn't close to that.  At best this amounts to 'serve these customers at your own risk' and it emphasizes all of the risks.  This light is a red light." *See*, http://www.coloradobankers.org/?60.   As a result of this view, shared by many depository institutions, initially, the FinCEN guidance did not result in meaningful access to banking for MRBs.

13.     After FinCEN's guidance went into effect, between February 14 and August 8, 2014, 105 individual financial institutions from states in more than one third of the country engaged in banking relationships with marijuana-related businesses.[4]   Nearly 400 financial institutions filed 3,157 marijuana-related suspicious activity reports in at least 42 states and the District of Columbia between February 14, 2014 and January 26, 2015.  Based on this data, FinCEN concluded that "banks are using our guidance and

---

[4] *Calvery Remarks at Page 4.*

providing much needed transparency into their dealings with marijuana-related businesses."[5] However, this notwithstanding, most MRBs continued to be denied access to bank accounts or have had their bank accounts suddenly closed by their financial institutions, leaving MRBs with having to incur substantial cash handling and safekeeping costs, and posing a serious public safety risk.

14.     If the District of Columbia is counted as a state, there are 24 states that have legalized medical cannabis for distribution, taxation and regulation. Five of those states have gone further to legalize cannabis for adult use.[6] An additional 15 states have legalized the use of low THC hemp based CBD oil for medical purposes.[7] Furthermore, 20 states have allowed industrial hemp growing and cultivation with regulations that violate federal law.[8] In total, there are only eight states (AR, ID, KS, LA, OH, PA, SD, WY) whose laws do not currently conflict with the federal Controlled Substances Act in some manner.  21 U.S.C. §801 *et seq.*  It is clear that the Federal Government's stance on cannabis prohibition is *not honored* by all but eight states.  The majority of those states have pending legislation to change their position as well. None of these state licensed, regulated, and taxed businesses have meaningful and stable access to traditional banking services. The few MRBs that have bank accounts are at constant risk of their accounts being closed on the sudden. The majority of MRBs are forced to operate in cash only, and to suffer the high cost of handling and safeguarding this cash. The public is at risk in having hundreds of millions of dollars of cash flowing about the streets of Colorado. The

---

[5] *Id.*

[6] http://medicalmarijuana.procon.org/view.resource.php?resourceID=000881

[7] http://www.celebstoner.com/news/marijuana-news/2014/03/13/four-states-on-verge-of-passing-cbd-only-laws/

[8] http://www.ncsl.org/research/agriculture-and-rural-development/state-industrial-hemp-statutes.aspx

'seed-to-sale' state and municipal regulation of cannabis works – until the point of sale when a sale generates cash.

**TFCCU Is Formed As a Colorado Credit Union**.

15.     Aware of the significant public safety concerns presented by the nearly all-cash marijuana industry,[9] and the widespread lack of access of Colorado MRBs to banking services, ten (10) courageous citizens formulated a plan to solve the problem. They came together in March of 2014 to organize a Colorado state-chartered credit union to develop a robust anti-money laundering ("AML") program to comply with the newly issued FinCEN guidance and Cole memorandum and thereby provide much needed banking services to compliant, licensed cannabis and hemp businesses and potentially to thousands of persons, businesses and organizations that support the legalization of marijuana.   They formulated a local solution to a local problem.

16.     Martin Kenney, a world-renowned anti-fraud and anti-money-laundering expert, was the primary architect of the credit union's compliance program.   Experts in the fields of law, banking, the principles of financial accounting for credit unions, academia, the psychology of fraud and money laundering, technology, specialist risks insurance, marketing, marijuana regulation, government relations, law enforcement and state regulators were engaged in the collaborative process.

17.     The proposed credit union's business plan was straightforward – (i) build a Colorado state-chartered credit union around a culture of compliance; (ii) take compliance out from behind the desk and into the field; (iii) charge credit union members service fees commensurate with the cost of the enhanced due diligence required by the

---

[9] *Does Anybody Want $3 Billion in Cash from Pot Sales?* Geiger, Hamilton and Dexheimer, Bloomberg.com, May 15, 2015, http://www.bloomberg.com/news/articles/2015-05-12/banks-just-say-no-to-weed-as-treasury-pushes-the-business

FinCEN guidance and Cole memorandum; (iv) diversify risk by having members of multiple associations included within the credit union's field of membership, not just licensed cannabis and hemp businesses; (v) engage as credit union members supporters of the social movement that supports the legalization effort based upon a belief in personal liberty, state's rights and wellness; and (vi) become a regulatory partner with state and federal government to perform the "gatekeeper" function as envisioned by the FinCEN guidance and the Bank Secrecy Act ("BSA").

18.     On April 2, 2014, pursuant to C.R.S. §§11-30-101 *et seq*., TFCCU applied to the Colorado Division of Financial Services ("DFS") for a *de novo* state credit union charter to serve a field of membership of persons, businesses, and organizations that support the legalized cannabis and hemp industries – by the submission of a voluminous charter application that laid out TFCCU's business plan.

19.     Upon receipt of the application for a state credit union charter, pursuant to C.R.S. §§11-30-101(1)(a), (3)(a) and (b), the Colorado State Commissioner of the DFS was required by law to determine: (a) whether TFCCU was a cooperative association established for the purpose of promoting thrift among its members and creating a source of credit at fair and reasonable rates of interest; (b) whether the proposed field of membership was limited to groups having a common bond of association; (c) whether the application conformed to the provisions of the Colorado Credit Union Act, C.R.S. §§11-30-101 *et seq*.; (d) whether such a credit union would benefit the members and proposed members thereof, consistent with the purposes of the Act; (e) the general character and fitness of TFCCU's proposed incorporators and organizers; (f) the economic advisability of establishing the proposed credit union; (g) whether the proposed incorporators and

organizers were qualified; and (h) whether their qualifications and financial experience were consistent with their responsibilities and duties.

**The 'Dual' Banking System in the United States**.

20.     Historical context is useful in analyzing the present controversy.   The banking system in the United States is described as "dual" because it is made up of separate federal and state component systems. This duality has existed in various forms since the earliest years of our nation, and while the federal and state components of the system have evolved in structure over the years, the essential characteristics of the system's duality have not. The federal system is based on a federal bank charter, powers defined under federal law, operation under federal standards, and oversight by a federal supervisor. The state system is characterized by state chartering, bank powers established under state law, and operation under state standards, subject to state supervision. As Professor Kenneth Scott wrote in his landmark analysis of the dual banking system, the "… very core of the dual banking system is the simultaneous existence of different regulatory options that are not alike in terms of statutory provisions, regulatory implementation and administrative policy."[10]

21.     Over the past 153 years the dual banking system in the United States has remained firmly anchored in the modern world of banking and finance.  Over this time, "… financial markets in the United States have developed into world-class centers of capital and have led financial innovation."[11]

---

[10] Kenneth E. Scott, *The Dual Banking System:  A Model of Competition in Regulation*, 30 Stan. L. Rev. 1, 41 (1977).

[11] *Perspectives on 150 Years of Dual Banking*:  Conference of State Bank Supervisors, State-Federal Supervisory Forum, Savannah, Ga., May 22, 2012, Speaker, Esther L. George, Page 1.

22.     Thousands of state-chartered and federal-chartered financial institutions, most of which are small community banks and credit unions, "allow credit to flow to individuals and businesses, even in remote areas of our country."[12]  This structure has allowed local communities to promote and protect local economic interests.

23.     The power to charter a credit union is reserved to the states under the Tenth Amendment to the United States Constitution.  *U.S. CONST. amend X.*  This reservation of power creates a bedrock level of state sovereignty upon which the federal government cannot impinge.

24.     The Federal government has control over two key aspects of the dual banking system pertinent to these proceedings: (1) depository insurance; and (2) access to the Federal Reserve payments system.

**The Need for Share Deposit Insurance**.

25.     Pursuant to C.R.S. §11-30-117.5(1) "[e]ach credit union shall apply for insurance on its shares and deposits as provided by the national credit union administration board under section 201 of the 'Federal Credit Union Act', 12 U.S.C. sec. 1781, or comparable insurance approved by the commissioner."

26.     Pursuant to C.R.S. §11-30-117.5(3) "[n]o credit union shall be granted a charter by the commissioner unless such credit union has applied for insurance on its shares and deposits as provided in this section."

27.     The credit union system is a labyrinth of financial institutions and cooperatives as well as administrative and regulatory agencies on both the state and federal levels.  The first credit unions were organized under state law, and are governed

---

[12] *Id.*

by state regulations.  In 1934, Congress enacted the Federal Credit Union Act ("FCUA"), which authorized the creation of federally-chartered credit unions and created the NCUA to supervise those federally-chartered credit unions.  In 1970, Congress amended the FCUA and established the National Credit Union Share Insurance Fund ("NCUSIF"), which is administered by the NCUA Board.  12 U.S.C. §§1781–1790d.  This fund provides insurance for accounts of federal credit unions for the first $250,000 per account, *Id.* §§1781(a), 1787(k), as well as accounts of state-chartered credit unions that elect to be covered.  Each insured credit union pays and maintains with the NCUSIF a deposit in the amount of 1% of the credit union's insured shares.  *Id.* §1781(c)(1)(A)(i).  The NCUSIF provides the Board with broad regulatory authority over all federally-insured credit unions, and grants the Board authority to review the federal deposit insurance applications of state-chartered credit unions.  With this authority the NCUA Board may disapprove the application of any credit union for insurance of its members' accounts if it finds that (a) its reserves are inadequate, (b) its financial condition and policies are unsafe or unsound, (c) its management is unfit, (d) insuring its member accounts would otherwise involve undue risk to the NCUSIF, or (e) its powers and purposes are inconsistent with the promotion of thrift among its members and the creation of a source of credit for provident or productive purposes.  *Id.* §1781(c)(2).  However, "a credit union whose application for share insurance is disapproved shall receive a letter indicating the reasons for such disapproval, a citation of the authority for such disapproval, and suggested methods by which the applying credit union may correct its deficiencies and thereby qualify for share insurance."  12 C.F.R. §741.3(f).  The requirement that the NCUA advise applicants on how to correct deficiencies is in

recognition of the "unique role" small and "new credit unions play in the lives of their members and communities." See, NCUA website http://www.ncua.gov/Resources/OSCUI/Pages/default.aspx.  The NCUA claims that it is "committed to helping these credit unions not only survive, but thrive." *Id.*

**TFCCU Applies for NCUA Share Deposit Insurance**.

28.     On April 7, 2014, TFCCU contacted NCUA Consumer Access Analyst David B. Nichols by telephone to determine the procedure TFCCU should follow to obtain federal share deposit insurance under the NCUSIF.  Mr. Nichols advised TFCCU to send the same charter application package sent to the Colorado DFS and the NCUA would perform the insurance review.

29.     On April 18, 2014, TFCCU attorney Douglas J. Friednash ("Friednash") of Brownstein Hyatt Farber Schreck (Denver) wrote Mr. Nichols to request federal share deposit insurance for the proposed TFCCU and provided the NCUA with a true and complete copy of the charter application materials provided to Colorado DFS.

30.     TFCCU sought its charter from Colorado DFS, the state regulator, and federal share deposit insurance from the NCUA, concurrently.

31.     On April 23, 2014, TFCCU attorney Friednash emailed Mr. Nichols and advised that he represented TFCCU and would like to talk with Mr. Nichols "about our application for federal share insurance."  Mr. Nichols responded: "Ruth Siragusa, an analyst in our office, will be calling you to discuss your application."

32.     On April 23, 2014, TFCCU attorney Friednash had a telephone call with NCUA Consumer Access Analyst Ruth Siragusa in which she confirmed she was able to

open the electronically submitted charter materials.  Ms. Siragusa stated it would take her

2 to 3 weeks to perform a "cursory review" of the charter materials.

33.     On May 23, 2014, TFCCU received a letter from NCUA Office of

Consumer Protection Director Gail W. Laster.  Ms. Laster acknowledged receipt of the

charter application submitted by TFCCU to DFS.  Ms. Laster stated that NCUA "did not

receive documents for an application of federal share insurance" and she directed TFCCU

to the NCUA website link to "NCUA Form 9600 – Application of a State Chartered

Credit Union for Insurance of Accounts."   The letter stated:

> We also recommend any group interested in forming a credit union that
> deals with the cannabis industry review the following documents:
> Department of Treasury, Financial Crimes Enforcement Network, FIN-
> 2014-G001, 'BSA Expectations Regarding Marijuana-Related Businesses'
> (February 14, 2014); James M. Cole, Deputy Attorney General, U.S.
> Department of Justice, 'Memorandum for All United States Attorneys:
> Guidance Regarding Marijuana Related Financial Crimes' (February 14,
> 2014) and James M. Cole, Deputy Attorney General, U.S. Department of
> Justice, 'Memorandum for All United States Attorneys:  Guidance
> Regarding Marijuana Enforcement' (August 29, 2013).

34.     Ms. Laster pointed out that these documents "mark a shift in policy."  The

letter stated:

> The fact that marijuana continues to be illegal under federal law would
> weigh heavily in a policy determination on chartering a credit union.  In
> addition, it seems that a cannabis industry credit union may pose undue
> risks to the National Credit Union Share Insurance Fund ("NCUSIF") and
> a share insurance application may be declined for that reason.   For
> example, our understanding is this particular industry is unusually cash
> intensive, which could pose unique risks and raise safety and soundness
> concerns.

35.     On June 26, 2014, TFCCU amended its charter application to make

changes suggested by Colorado DFS during the course of its review.

36.     On July 2, 2014, Colorado DFS granted TFCCU a state credit union charter, conditioned upon TFCCU obtaining federal share deposit insurance from the NCUA.   The grant of the charter was based on statutorily required findings by the Colorado Commissioner of the Division of Financial Services that: (a) TFCCU was a cooperative association established for the purpose of promoting thrift among its members and creating a source of credit at fair and reasonable rates of interest; (b) that TFCCU's proposed field of membership was limited to groups having a common bond of association; (c) that TFCCU's application conformed to the provisions of the Colorado Credit Union Act, C.R.S. §§11-30-101 *et seq*.; (d) that TFCCU would benefit the members and proposed members thereof, consistent with the purposes of the Act; (e) that the general character and fitness of the incorporators was satisfactory; (f) that TFCCU was economically viable; (g) that the proposed incorporators and organizers were qualified; and (h) their qualifications and financial experience were consistent with their responsibilities and duties.   The Commissioner's findings are entitled to a presumption of validity.

37.     On July 18, 2014, in a letter to the State of Washington Department of Financial Institutions, NCUA Office of Examination and Insurance Director, Larry Fazio, expressed the policy of the NCUA relative to the legal ability of federally chartered and federally insured state-chartered credit unions to provide services to marijuana-related businesses in the following terms:  "NCUA has provided the FinCEN guidance to agency examiners, who are responsible for determining the compliance of financial institutions that provide service to marijuana-related businesses."

38.     On August 7, 2014, TFCCU sought to determine from Ms. Siragusa whether TFCCU should wait until it had acquired its Form 23 Surety Bond (covering bank robbery, employee dishonesty and other fidelity risks) before sending in the NCUA "Form 9600 – Application of a State Chartered Credit Union for Insurance of Accounts." Ms. Siragusa advised "I would hate to have you purchase the surety bond in case it takes 2 months to get everything approved."

39.     On August 13, 2014, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation ("FDIC"), the NCUA and the Office of the Comptroller of the Currency (collectively, the "Agencies") issued a federal policy statement to the effect that the Agencies had formally incorporated the FinCEN guidance on "BSA Expectations Regarding Marijuana-Related Businesses" ("FinCEN Guidance") into their respective supervisory processes.  The Agencies reported that the federal policy related to federally regulated depository institutions banking MRBs is as follows:

> Generally, the decision to open, close or decline a particular account or relationship is made by a bank or credit union, without involvement by its supervisor.  This decision may be based on the bank or credit union's particular business objectives, its evaluation of the risks associated with offering particular products or services, and its capacity to effectively manage those risks.

40.     On August 25, 2014, acting pursuant to the American Bankers Association Routing Number Policy (Revised 3/12), ACCUITY (as Registrar of Bank Routing Numbers to the American Bankers Association) issued a Routing Number to TFCCU, thus determining TFCCU was eligible to maintain an account at a Federal Reserve Bank. To be eligible to open an account at a Federal Reserve Bank, an organization can be a state chartered "depository institution" as defined in 12 U.S.C. §461(b)(1)(A).  The term "depository institution" means – "(iv) any insured credit union as defined in section 1752

of this title or **any credit union which is eligible to make application to become an insured credit union** pursuant to section 1781 of this title." *Id.* (emphasis supplied).

41.     On September 4, 2014, TFCCU submitted to the NCUA's Board a fully completed "NCUA Form 9600 – Application of a State Chartered Credit Union for Insurance of Accounts," together with all schedules and information required by NCUA Form 9600. NCUA Form 9600 is 16 pages in length; it contains 21 questions and calls for the submission of 7 schedules.   TFCCU provided *all* information required to be provided with the application in respect to a deposit insurance application by a new credit union.

42.     On September 26, 2014, TFCCU attorney Friednash wrote Ms. Laster of the NCUA and advised that TFCCU was prepared to apply due diligence and 'know-your-customer' standards that:

> … go far beyond the guidance issued to date.  An industry-first 'Active AML Unit' will be part of the new Credit Union.   It will include a multi-disciplinary team of traditional AML Compliance Officers with former law enforcement investigators and forensic accountants.  The 'New Active AML Unit' will combine desk-top research and fact finding now used by financial institutions with field audits of member businesses, intelligence gathering, and working with local law enforcement and State and municipal regulators of the legalized cannabis industry. . . . In the vein of transparency, we would like to meet with you as soon as possible to personally discuss our application and provide you with a closer look at how we would play a vital role in providing much needed financial services in a regulated environment while simultaneously working collaboratively [to] protect the institution from bad actors.  I trust you will find a financial institution that has carefully considered its products and practices, assessed its own risks, and developed programs that mitigate its unique risks.  This would give us a chance to address any questions or concerns that you might have.

43.     On October 1, 2014, TFCCU attorney Friednash provided Ms. Laster with letters in support of TFCCU's application for federal share deposit insurance.

44.     On October 8, 2014, NCUA Consumer Access Analyst Siragusa declined TFCCU's request for an in-person meeting with Ms. Laster to discuss the pending federal share deposit insurance application because the NCUA had not yet reviewed the application.   She stated:

> We do have a bit of a backlog in the office and we are in the process of just beginning to open and look at your package and we really don't want to set up a time frame within the next couple of weeks because then that ties us down to we have to completely have your package reviewed . . .

45.     On or about October 22, 2014, U.S. Senator Michael Bennet's (D-CO) Chief of Staff called the NCUA's Office of Public and Congressional Affairs to seek to facilitate a meeting between TFCCU and the NCUA.

46.     On or about October 23, 2014, Ms. Siragusa emailed TFCCU attorney Friednash indicating that the NCUA would participate in a telephone conference call with representatives of TFCCU on October 30, 2014.

47.     On October 23, 2014, TFCCU provided the NCUA with additional unsolicited documentation in support of its application for federal share insurance. Specifically, TFCCU provided the NCUA with: (a) evidence that the lead architect of its anti-money laundering ("AML") compliance program, attorney Martin Kenney, had, in June 2014, been given a lifetime achievement award from the 75,000 member Association of Certified Fraud Examiners ("ACFE") "for major lifetime contributions to the detection and deterrence of fraud"[13]; (b) a letter from credit union software vendor EPL, Inc. that TFCCU's core processing software had the ability to meet its "broad internal and external compliance requirements"; (c) a letter from AML International, Inc.

---

[13] The ACFE is the world's largest association of anti-fraud and anti-money laundering professionals (with 75,000 members in 160 countries).  The Cressey Award bestowed on Mr. Kenney is the ACFE's highest honor.

of Miami, Florida, a top provider of financial crime risk management training services that worked with TFCCU in the preparation of its customized AML compliance manual stating that "the implementation of the procedures set forth in [TFCCU's] AML compliance manual, combined with planned investigative resources and personnel to achieve the intended goals, will result in [TFCCU] employing the best practices available to financial institutions to combat money laundering"; and (d) a letter from Colorado Governor John W. Hickenlooper, which indicated that the Governor was "writing in support of The Fourth Corner Credit Union's NCUA Application of a State Chartered Credit Union for Insurance of Accounts," and indicating that the State had "worked with [TFCCU]in helping them obtain their charter from the Colorado Division of Regulatory Agencies, Division of Financial Services"; and that State "regulators have already approved their application and they have a talented board consisting of well-respected government, non-profit and business leaders."

**October 30, 2014 Telephone Conference Call between TFCCU and the NCUA**.

48.    On October 30, 2014, a telephone conference call was held between TFCCU attorneys and (a) NCUA Consumer Access Analyst Ruth Siragusa, (b) NCUA Director, Division of Consumer Access, Rob Leonard, (c) NCUA Director, Division of Consumer Access Rita Woods, (d) NCUA Accountant Takia Thomas, (e) NCUA Staff Attorney Pamela Yu and (f) NCUA Legislative Analyst Katherine Doddridge. Notwithstanding the serious public safety issue facing Colorado which TFCCU had been formed to ameliorate, NCUA representatives informed TFCCU's attorneys that it could take up to 2 years for the NCUA to act on TFCCU's share deposit application.  Also, the NCUA representatives advised TFCCU that the fact that TFCCU had licensed marijuana-

related businesses ("MRBs") in its field of membership *did not preclude* TFCCU from obtaining federal share deposit insurance.  If the fact marijuana was federally illegal precluded a credit union that proposed to provide services to MRBs (and thousands of supporters of the industry) from *obtaining* federal share deposit insurance, or precluded federally insured credit unions that provided services to MRBs from *continuing* to be covered by federal share deposit insurance, the NCUA should have so advised  -- as the further evaluation of the pending federal share deposit insurance application (for a period of up to 2 years) would have been an unnecessary exercise. The purpose of the conference call was to discuss the pending federal deposit insurance application.  During this call, NCUA representatives did not request any additional information from TFCCU, nor did the NCUA state that TFCCU's application for federal share deposit insurance was in any way deficient. Near the end of this conference call, Ms. Siragusa indicated that as a part of the process of reviewing TFCCU's application for share insurance, she would need to travel to Denver, Colorado to inspect TFCCU's facilities and meet with its team. Ms. Siragusa said that the process would be a collaborative one where, by the end of it, "we would be friends." No representative of the NCUA performed a site visit on TFCCU at any time.

49.     NCUA stated policy does *not* prohibit federally insured credit unions from serving MRBs.

50.     On November 17, 2014, a TFCCU Board member sent a letter to NCUA Chairperson Debbie Matz, NCUA Director Office of Consumer Protection Laster and Consumer Access Analyst Siragusa.  The letter stated:

> … the timeliness of the NCUA's action on TFCCU's share deposit
> insurance application has a direct impact on the ability of sick children and

others with debilitating conditions to receive help and upon the charitable funding of promising medical research.

51.     The TFCCU Board asked the NCUA to take expedited action on TFCCU's pending federal deposit insurance application.   The NCUA did not respond to this letter.

**November 19, 2014 – TFCCU Is Given an Unconditional Charter by Colorado**.

52.     On November 19, 2014, the Colorado Commissioner of DFS granted TFCCU an *unconditional* Colorado state credit union charter pursuant to C.R.S. §11-30-117.5(3). This statutory provision provides for the issuance of a final unconditional charter after a credit union "has applied for" share deposit insurance.

53.     On the same day, November 19, 2014, Ms. Siragusa sent TFCCU attorney Friednash an email that stated: "NCUA is sending a letter requesting additional information in order to continue processing your Application for Insurance of Accounts." The email contained a *new list* of items the NCUA was now requesting -- *none* of which are referenced anywhere in the "NCUA Form 9600 – Application of a State Chartered Credit Union for Insurance of Accounts," and none of which had been requested since April 18, 2014 (seven months prior) when TFCC first submitted its request for federal share deposit insurance to the NCUA.   Ms. Siragusa's email stated the newly requested "information can be sent to me on a flow basis."

54.     On November 20, 2014, TFCCU attorney Friednash emailed Ms. Siragusa that TFCCU was:

> …eager to provide you with any and all relevant information that is available to us.  Some of the information will only be available after the credit union's doors are open; for example, the information requested related to the hiring of employees.  How would you like us to handle that? In the meantime we will gather the information you requested as quickly

as we can.  Per your email we will produce this as it is completed and
available.  Please do not hesitate to contact me if you have any questions
or need any additional information.

55.     On November 21, 2014, Ms. Siragusa sent TFCCU attorney Friednash an

email that stated that "for the most part" her additional information request was standard.

She indicated that "at some point in time" the NCUA wanted to see the performance

standards to evaluate key personnel.

56.     On December 5, 2014, TFCCU responded to Ms. Siragusa's November

19, 2014 email stating it could not provide the requested "Form 4012 – Report of Official

and Agreement to Serve" as TFCCU had not yet employed any persons and was "not in a

position to provide you with completed NCUA 4012s on any actual employees."

However, TFCCU enclosed the sworn Colorado Division of Financial Services

Biographical Reports on each TFCCU board member.   TFCCU indicated its "formal

written policy documents" would be provided to the NCUA prior to opening.  The Form

9600 only required an *outline* of loan polices, and this was provided. TFCCU answered

many of the new questions raised by Ms. Siragusa in her November 19, 2014 email. The

response was provided to Ms. Siragusa by Federal Express and by email dated December

8, 2014.  The email closed: "should you have any questions, please do not hesitate to

contact me." Ms. Siragusa never responded to the December 5, 2014 letter, nor did she

ever indicate that the letter failed to properly respond to her new inquiries.

57.     On or about December 1, 2014, the Federal Reserve Bank of Kansas City

("FRB-KC") asked the NCUA if TFCCU was "eligible to make application to become an

insured credit union" pursuant to 12 U.S.C. §1781.  The reason the question was posed in

this precise manner is because *if* TFCCU was "eligible to make application to become" a

federally insured credit union, it was eligible for a master account at FRB-KC, pursuant to the (a) Monetary Control Act of 1980, 12 U.S.C §248a(c)(2), (b) Federal Reserve Banks Operating Circular 1, Account Relationships, Effective September 1, 2011, and (c) the American Bankers Association Routing Number Administrative Board Routing Number Policy, Section II (Revised 3/12).  In other words, a new state-chartered credit union is entitled to a master account irrespective of whether it has *obtained* federal share deposit insurance; it only need be "eligible to make application to become" federally insured.

58.    Currently, there are approximately 129 operating state-chartered credit unions that have *private* (primary) share deposit insurance.  The NCUA does not oversee these state-chartered, privately insured credit unions. A state-chartered credit union with private share deposit insurance is not subject to NCUA regulation, supervision or examination. As a policy matter, in 2007 the NCUA issued a report to Congress concluding that the NCUA should be the sole provider of primary deposit insurance. The NCUA has tried for 8 years, without success, to get Congressional support for its plan to abolish private share deposit insurance. The NCUA wants to exert federal control over all state-chartered credit unions.  As illustrated by this case, the NCUA does not trust Colorado regulators to regulate, examine and supervise its state chartered credit unions without NCUA oversight.

**December 16, 2014 – The NCUA Asks Two Further Questions of TFCCU**.

59.    On December 16, 2014, Ms. Laster wrote TFCCU attorney Friednash. This was the letter that Ms. Siragusa indicated would be forthcoming from the NCUA in her November 19, 2014 email to attorney Friednash requesting additional information.

Nowhere in Ms. Laster's letter did it indicate that TFCCU's submissions, to date, were in any way deficient.  Rather, the letter defined the precise manner in which the NCUA would proceed with its review of TFCCU's deposit insurance application, to wit:

> We have completed an initial review of your application for federal share insurance.
>
> While we continue to evaluate the materials you submitted in support of your federal share insurance application, we have considerable concerns about your credit union's ability to effectively mitigate safety and soundness concerns due to its current business model.  The credit union must satisfactorily address the concerns discussed below before we can continue to process your application.
>
> We acknowledge receipt of additional materials you submitted on December 9, which are presently under review.  However, candidly, we are not confident you can overcome the inordinate high level of risk the credit union would place on the NCUSIF, and the collective interests of 6,360 existing federally insured credit unions.  Therefore, before we move forward with a final evaluation of your federal insurance application, you must satisfactorily address the following threshold issues: (1) how your credit union, with an FOM comprised primarily of individuals and businesses engaged in marijuana-related activities, will satisfy the enhanced monitoring requirements of the Department of Justice and FinCEN guidance; and (2) how your credit union intends to manage and mitigate the significant inherent risks presented by its business model, such that insuring your credit union will not create an undue risk to the NCUSIF.  We would appreciate receiving this information within 60 days of the date of this letter.

60.     On December 19, 2014, TFCCU attorney Friednash wrote Ms. Laster to advise that the NCUA failed to respond to the direct question raised by the Federal Reserve Bank of Kansas City as to whether TFCCU was "eligible to make application to become" insured by the NCUSIF.  The Friednash letter stated:

> we understand you are seeking additional information in order to make a decision on whether to ultimately grant or deny the share deposit insurance application.  We will continue to timely address your issues and concerns as we move forward collaboratively.

61.     On January 7, 2015, Esther L. George, President of the Federal Reserve Bank of Kansas City ("FRB-KC"), stated that FRB-KC would "consider FCCU's response to the National Credit Union Administration" (questions about enhanced monitoring and risk mitigation) before deciding whether to open a master account for TFCCU at FRB-KC.  The opening of a master account for a state-chartered credit union (or other depository institution) normally takes 5 to 7 days.

62.     Upon information and belief, representatives of FRB-KC had improper *ex parte* conversations with NCUA decisional employees about confidential information provided by TFCCU to the NCUA, as well as about the merits of TFCCU's pending federal share deposit insurance application.

63.     Upon information and belief, on or about January 13, 2015, the NCUA advised FRB-KC in writing that TFCCU was eligible to make application to become federally insured by the NCUA.  The NCUA failed to provide TFCCU with a copy of this communication and, upon information and belief, failed to place the same in the administrative record of these proceedings.

64.     On January 20, 2015, TFCCU attorney Steven W. Farber wrote FRB-KC President George that:

> TFCCU is a 'depository institution' entitled to a master account at the FRB, based on the NCUA's confirmation of its eligibility to make application to become an insured.  With this confirmation, combined with the required documentation previously submitted, TFCCU respectfully renews its request for the establishment of a master account at the FRB, subject to the execution of a master account agreement in the prescribed form.

65.     On February 13, 2015, TFCCU sought an extension of time to respond to the NCUA's supplemental information request of December 16, 2014.  Ms. Laster

approved TFCCU's request to have until March 2, 2015 to respond to her December 16, 2014 letter.

**March 2, 2015 – TFCCU Response to the NCUA's December 16, 2014 Letter Posing Two Questions**.

66.     On March 2, 2015, TFCCU fully responded to the NCUA's letter of December 16, 2014, that asked how TFCCU would overcome the NCUA's threshold issues: "(1) how your credit union, with an FOM comprised primarily of individuals and businesses engaged in marijuana-related activities, will satisfy the enhanced monitoring requirements of the Department of Justice and FinCEN guidance; and (2) how the credit union intended to manage and mitigate the significant inherent risks presented by its business model, such that insuring your credit union will not create an undue risk to the NCUSIF?"  TFCCU's 14-page response detailed a peer-reviewed best practices risk and AML compliance program developed over eleven (11) months by world-renowned anti-money laundering and anti-fraud attorney Martin Kenney, in collaboration with AML International, Inc., a top provider of financial crime risk management training services, as well as industry regulatory experts, an academic expert on the principles of financial accounting of credit unions, banking experts, forensic accountants, regulators, former law enforcement, insurance experts, an expert in human factor dynamics in institutional fraud, and a team of in excess of ten (10) legal professionals.  The response summarized the most salient parts of a 150-page Risk Management and AML Compliance Manual. It detailed the procedure for risk-weighing of credit union account typologies, a robust customer identification program, complete with MRB field compliance assessments guided by a 135-item proprietary checklist, account monitoring, a strategy for fostering a culture of compliance amongst CU employees and CU members, the filing of Suspicious

Activity Reports ("SARs") and Currency Transaction Reports ("CTRs"), information sharing with law enforcement and regulators, technology and software relevant to TFCCU's AML compliance system, and TFCCU's proposed chief compliance officer's qualifications and training. TFCCU vowed to comply with the DOJ's and FinCEN's guidance on banking MRBs and be a good regulatory partner with state and federal government.

67.     TFCCU's response pointed out to the NCUA that its statement that TFCCU served MRBs "primarily" or solely was incorrect.  Rather, TFCCU's business model embraces 3 types of account holders – *Type 1* accounts consisting of licensed cannabis and hemp businesses (or MRBs); *Type 2* accounts, consisting of accounts of companies that directly or indirectly serve the regulated cannabis industry; and *Type 3* accounts, consumer accounts and non-marijuana related business accounts; with *Type 3* accounts being expected to be the *vast majority* of member accounts.  Prospective *Type 3* account holders are the persons that believe in the social movement grounded in state's rights, personal liberty and wellness.  TFCCU's response detailed how it would manage the risk presented by the MRB segment of its membership. It detailed a conservative loan and investment policy; it explained how the risk of handling cash was mitigated by armored cash transport and the existence of a surety bond; and, it explained how risk to the NCUSIF was further mitigated by the existence of a directors & officers liability policy and TFCCU's enhanced compliance protocols related to MRBs.

68.     On March 6, 2015, United States Senator Michael F. Bennet (D-CO) wrote a letter to Janet Yellen, Chair, Board of Governors of the Federal Reserve System , and Esther George, President, Federal Reserve Bank of Kansas City.  Senator Bennet

advised Ms. Yellen and Ms. George that the nearly all-cash nature of state licensed cannabis businesses "raised significant public safety concerns" and that the "cash only nature of these businesses has also made it more difficult for the state to audit these entities and to conduct oversight." The letter requested that the Reserve Bank "work directly with the credit union to the extent that it has not satisfied the necessary terms and conditions to open a master account."

69.     On March 19, 2015, TFCCU's CEO Deirdra O'Gorman wrote Ms. Yellen and Ms. George to request a meeting:

> to elaborate on TFCCU's compliance, risk management, enhanced due diligence protocols, and [the] state's robust regulatory structure, to the extent such information is pertinent to the FRB's determination of the risk(s) posed by the financial institution and how that risk can be managed to the satisfaction of the Reserve Bank.

70.     Ms. Yellen and FRB-KC declined to meet with TFCCU representatives. FRB-KC specifically instructed TFCCU not to submit any more documentation to FRB-KC.

71.     On July 1, 2015, Janet L. Yellen, Chair of the Board of Governors of the Federal Reserve System, wrote United States Senator Michael F. Bennet (D-CO) regarding TFCCU's request for a master account stating:

> As you know, this case raises issues regarding compliance with Federal law, which currently prohibits certain activities related to marijuana. This matter is also pending before the National Credit Union Administration, which is considering whether FCCU qualifies for deposit insurance under Federal law.

**The NCUA Rejects TFCCU's Application for Share Deposit Insurance**.

72.     From December 16, 2014 to July 2, 2015, six and one-half months of time passed. Throughout this period, the NCUA remained substantively silent. Without any

advance warning of alleged deficiencies in TFCCU's responses and submissions, on July 2, 2015, the NCUA Office of Consumer Protection issued a letter of disapproval of TFCC's application for federal share deposit insurance, stating the NCUA's "fundamental concerns about the inherent risks of TFCCU's business model remain unresolved"; that TFCCU "has no historical data NCUA can use to make a decision in determining insurance risk"; that TFCCU "did not provide sufficient information and documentation to allow NCUA to make fundamental determinations about risk to the NCUSIF"; that "TFCCU did not provide sufficient information and documentation to allow NCUA to make fundamental determinations about the insurability of its accounts concerning: 1) how TFCCU would comply with the enhanced monitoring requirements and guidance for marijuana-related businesses; and 2) how TFCCU would manage and mitigate the extensive risk associated with a business model of only serving marijuana-related businesses"; that "TFCCU does not fully understand the comprehensive practices and oversight that are essential to ensure compliance with DOJ and FinCEN requirements for enhanced BSA monitoring marijuana-related activities"; and that:

> TFCCU did not sufficiently document management's intent to mitigate the risk associated with serving a single industry that does not have an established track record of success and remains illegal at the federal level. Therefore, NCUA cannot conclude that the credit union has established proper policies and procedures to effectively manage its BSA/AML program. This is an unacceptable risk to the share insurance fund.

73. The NCUA raised additional concerns, including (1) whether there is adequate interest among the potential credit union members to promote thrift; (2) the general character and fitness of the credit union's management; (3) the projected financial condition of the credit union as a start up and following the first two years of operations; and (4) whether the draft or approved credit union policies and written procedures

adequately address risk, safety, and soundness.  The NCUA's letter of disapproval concluded as follows:

> Given the current legal environment and TFCCU's business model, it appears that TFCU is not likely to overcome our numerous fundamental concerns with its application.  Therefore, at this time, we suggest that TFCCU seek alternatives to federal insurance of accounts to meet its financial needs.

74.    The NCUA letter of disapproval stated: "This constitutes a final agency decision reviewable pursuant to the Administrative Procedure Act, 5 U.S.C. §701 *et seq*."

75.    The NCUA permits federally chartered and federally insured credit unions that it supervises, regulates and insures to provide services to marijuana-related businesses ("MRBs").

76.    12 C.F.R. §741.3, setting forth the criteria for obtaining federal share deposit insurance, also governs the terms upon which a credit union can *continue* to have its accounts federally insured.

77.    The NCUA has no written policies, rules, regulations, guidance or objective standards for determining whether a credit union has the ability to satisfy the DOJ, FinCEN, BSA/AML enhanced monitoring requirements and guidance for MRBs, notwithstanding that the NCUA Board has the power to "prescribe such rules and regulations as it may deem necessary or appropriate to carry out the provisions" of the NCUSIF.  *Id.*  §1789 (a) (11).  The sole NCUA policy statements on banking MRBs are contained in the NCUA letters dated July 18, 2014 and August 13, 2014, respectively, as well as the FinCEN guidance and the Cole Memo.

78.     Federal banking agencies recognize that as a practical matter, it is not possible for a financial institution to detect and report all potentially illicit transactions that flow through an institution.[14]

79.     The NCUA lacks expertise in the operation and regulation of the state legalized cannabis industry that would be necessary for it to formulate a list of relevant factors upon which to base a decision about enhanced due diligence, or establish guidance, rules or regulations about banking MRBs.  Moreover, the NCUA lacks a basic understanding of Colorado's robust regulatory structure for licensed cannabis businesses – an understanding that is absolutely necessary to apply the FinCEN guidance to effectuate enhanced due diligence in the provision of banking services to MRBs.

80.     Credit unions subject to regulation by the NCUA, state credit union regulators, and federal lawmakers have requested that the NCUA provide rules and regulations to clarify the general principles articulated by the DOJ and FinCEN guidance governing the provision of banking services to MRBs.  The NCUA has failed to provide such clarification.

**July 16, 2015 – FRB-KC Rejects TFCCU's Application for a Master Account**.

81.     On July 16, 2015, FRB-KC issued a letter denying TFCCU's request for a master account. FRB-KC based its denial on the NCUA's (constitutionally, procedurally and substantively defective) July 2, 2015 letter of disallowance.

82.     The NCUA and FRB-KC acted in concert to unlawfully block TFCCU from gaining access to the Federal Reserve payments system, thereby necessitating the immediate filing of this action, and a separate related case against FRB-KC.

---

[14] See page 67 of the Federal Financial Institution Examination Council, Bank Secrecy Act/Anti-Money Laundering Examination Manual.

**FOR A FIRST CAUSE OF ACTION**

(Judicial Review Under APA – 5 U.S.C. §§701 *et seq.*)

(Declaratory Judgment – 28 U.S.C. §2201)

(NCUA deprived TFCCU of Due Process of Law in violation of the Fifth Amendment and the NCUA's own procedures)

83.     Plaintiff hereby repeats and realleges the foregoing allegations of the Complaint as if set forth herein verbatim.

84.     The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty or property without due process of law." U.S. CONST. amend V.

85.     TFCCU enjoys a property interest in obtaining the right to participate in the National Credit Union Share Insurance Fund ("NCUSIF").

86.     TFCCU has a legitimate claim of entitlement to participate in the NCUSIF, pursuant to 12 U.S.C. §1781 (§201 of the Federal Credit Union Act) and 12 C.F.R. §741.3, based on the terms of said statute and regulation.

87.     The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.

88.     "Due process requires that the plaintiffs be provided some opportunity to object in writing to the agency's rejection of their application.  This would be satisfied if the credit union, after notice, was permitted to submit objections to the NCUA, thus giving the NCUA an opportunity to explore those objections."  See, *Flood v. Veghts*, 878 F.Supp. 1083, 1090 (N.D.Ill. 1995).

89.     Upon information and belief, the informal adjudication procedure employed by the NCUA in acting on a "Form 9600 – Application of a State Chartered Credit Union for Insurance of Accounts" is, by default and according to NCUA practice,

the same procedure utilized by the NCUA for the processing of a federal credit union charter application set forth in the NCUA Chartering and Field of Membership Manual, Section VII. See, *Flood v. Veghts*, 878 F.Supp. 1083, 1090 (N.D.Ill. 1995). The procedure is as follows: The NCUA staff (apparently in the Office of Consumer Protection) reviews the application package and then makes a recommendation to the Regional Director regarding the application. The Regional Director then acts on the application. When a Regional Director disapproves the application the organizer is informed in writing of the specific reasons for the disapproval and where applicable the regional director will provide information concerning options or suggestions that the applicant could consider for gaining approval. If the Regional Director denies the charter application the decision may be appealed to the NCUA Board. The applicant may provide supplemental information to the Regional Director for reconsideration. The final decision of the Regional Director may be appealed to the NCUA Board. If the NCUA Board denies the application, the applicant may seek judicial review in federal court under the Administrative Procedure Act. *Id.*

90.     Upon information and belief, the NCUA's July 2, 2015 letter of disallowance of TFCCU's federal share deposit insurance application does not represent formal action of the Regional Director, or the NCUA Board, but *only* the action of the Director of the NCUA Office of Consumer Protection. The decisional employee was Gail W. Laster, the Director of the NCUA Office of Consumer Protection (not the Regional Director, and not the NCUA Board).

91.     The July 2, 2015 letter of disallowance is a confidential document, not subject to voluntary disclosure by the NCUA and not subject to production under the Freedom of Information Act.

92.     The Regional Director failed to act on TFCCU's federal share deposit insurance application in violation of the informal adjudication procedure employed by the NCUA in acting on such application, which procedure is set forth in the NCUA Chartering and Field of Membership Manual, Section VII.

93.     The NCUA Board failed to take formal executive action on TFCCU's application for share deposit insurance in violation of 12 U.S.C. §1781(a) and (c).

94.     The NCUA Board has not formally or legally *delegated* a final decision on a share deposit insurance application to the Director of the NCUA Office of Consumer Protection.  The Board must act on a share deposit application, unless it has formally and legally delegated its authority, power or function to another pursuant to 12 U.S.C. §1766(d). The statute provides "the Board shall consider" and approve or "the Board shall disapprove" a federal share deposit insurance application.  12 U.S.C. §1781(c)(1) and (2).  The term "Board" as used in the statute means NCUA board, "which consist[s] of three members, who are broadly representative of the public interest, appointed by the President, by and with the advice and consent of the Senate."  12 U.S.C. §1752(4), §1752a(b)(1); see 12 C.F.R. §700.2, §790.2(b)(1).

95.     The "NCUA Form 9600 – Information to be Provided in Support of the Application of a State Chartered Credit Union for Insurance of Accounts," at Page 13, states the application is presented "TO: The National Credit Union Administration Board."  All applications for action by the NCUA "shall be addressed to the appropriate

office" described in 12 C.F.R. §790.2.  The NCUA Board is "responsible for management of the National Credit Union Share Insurance Fund (NCUSIF)."  12 C.F.R. §790.2(b)(1).  Upon information and belief, the NCUA Board has not legally delegated its ultimate authority over the NCUSIF to the NCUA Office of Consumer Protection ("OCP").  Rather, OCP:

> provides consumer services, including consumer education and complaint resolution; establishes, consolidates, and coordinates consumer protections within the agency; acts as the central liaison on consumer protection with other federal agencies; nationalizes field of membership processing; absorbs centralized chartering activities; and assumes the activities of the agency's ombudsman.  12 C.F.R. §790.2 (16).

96.     The Regional Director's duties include: "Directing chartering, insurance, examination, and supervision programs to promote and assure safety and soundness."  12 C.F.R. §790.2(c)(2).  Thus, under the Code of Federal Regulations, the Regional Director and the NCUA Board must act on TFCCU's application to participate in the NCUSIF. The NCUA Board did not observe the procedure required by law. NCUA Office of Consumer Protection Director Laster acted in excess of her statutory jurisdiction and authority by purporting to take the *final* action of the NCUA on TFCCU's share deposit insurance application.

97.     The failure of an agency to follow its own regulations constitutes arbitrary and capricious conduct.   The courts must overturn agency actions that do not scrupulously follow the regulations and procedures promulgated by the agency itself.  A violation by an agency of its own regulations also constitutes a violation of the Administrative Procedures Act in that the agency's action is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. §706(2)(A).

98.     It is critical to due process that the NCUA follow the Fifth Amendment and its own procedures, especially in light of the fact that it appears not all of the NCUA Board members are closed-minded to solving the serious public safety problem presented by large amounts of cash on the streets – as represented by sales proceeds from marijuana businesses in states where cannabis is legal.  NCUA Board Member J. Mark McWatters is quoted as stating to *Credit Union Times* that for credit unions considering serving marijuana-related businesses, it generally comes down to a cost-benefit analysis.   Lack of critical mass when it comes to both the number and size of the marijuana businesses served may make service too costly, rendering the question moot for many credit unions:

> If you have a credit union with a substantial part of this business [referring to MRBs], you can probably afford to hire the lawyers and accountants to comply with the Cole memo and still sleep at night with the comfort you won't be indicted.

99.     To date, NCUA board member J. Mark McWatters has heard nothing from NCUA Chairman Debbie Matz about further discussing the NCUA's role when it comes to the question of credit union serving MRBs.  Mr. McWatters stated to Credit Union Times:

> One solution for the industry that does not require any changes by Congress or FinCEN may be for a subset of credit unions and banks or a CUSO that specializes in this area to operate with greater economies of scale and bring more of these businesses into the financial service system. M. Mickian, *Credit Union Times*, "Weed Industry Raises Public Safety Concerns", April 28, 2015.

100.    TFCCU proposes to specialize in the area contemplated by NCUA board member McWatters' remarks. With the unstoppable wave of cannabis legalization about to break on her doorstep, it is difficult to understand why the Chairman of the NCUA would not see fit to openly and clearly address the issue with those she seeks to regulate.

This perhaps explains why the NCUA's determination of TFCCU's federal share deposit insurance application never made it to the Regional Director, or the NCUA Board level where proceedings are on the record.  12 C.F.R. §791.17.

101.    The Court should declare that the NCUA deprived TFCCU of its right to property without due process of law in violation of the Fifth Amendment and in violation of the NCUA's own procedures. The court should hold unlawful and set aside in its entirety the NCUA's July 2, 2015 letter of disapproval of TFCCU's federal share deposit insurance application, as contrary to constitutional right, not supported by substantial evidence, without observance of procedure required by law, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. §706; 28 U.S.C. §2201.

## FOR A SECOND CAUSE OF ACTION

(Judicial Review Under APA – 5 U.S.C. §§701 *et seq.*)

(NCUA acted arbitrarily, capriciously, not in accordance with law and abused its discretion in concluding TFCCU is unable to satisfy DOJ, FinCEN and BSA enhanced monitoring requirements)

102.    Plaintiff hereby repeats and realleges the foregoing allegations of the Complaint as if set forth herein verbatim.

103.    In her constitutionally and procedurally defective informal adjudication of TFCCU's application for federal share deposit insurance, Ms. Laster, the Director of the NCUA Office of Consumer Protection, determined that TFCCU is unable to satisfy DOJ, FinCEN and BSA/AML enhanced monitoring requirements in respect of the provision of services to MRBs.   Director Laster stated rhetorically that TFCCU "does not fully understand the comprehensive practices and oversight that are essential to ensure

compliance with DOJ and FinCEN requirements for enhanced BSA monitoring for marijuana-related activities."

104.    TFCCU is adversely affected or aggrieved by the final agency action for which there is no other adequate remedy save for the remedies sought from this court.

105.    The NCUA has no written policies, rules, regulations, guidance or objective standards for determining whether a credit union has the ability to satisfy the DOJ, FinCEN and BSA/AML enhanced monitoring requirements and guidance for MRBs, notwithstanding that the NCUA Board has the power to "prescribe such rules and regulations as it may deem necessary or appropriate to carry out the provisions" of the NCUSIF.  *Id.*  §1789 (a) (11).

106.    The sole NCUA policy statements on banking MRBs are contained in the NCUA supervisory letters dated July 18, 2014 and August 13, 2014 and in the FinCEN guidelines and the Cole Memorandum.

107.    Federal banking agencies recognize that as a practical matter, it is not possible for a financial institution to detect and report all potentially illicit transactions that flow through an institution.[15]

108.    The NCUA lacks knowledge or expertise in the state legalized cannabis industry that would be necessary for it to formulate such rules and regulations. Moreover, the NCUA lacks a basic understanding of the Colorado's robust regulatory structure – an understanding that is necessary to apply the FinCEN guidance to effectuate enhanced due diligence.  If the NCUA cannot tell a state licensed good actor from a state law violator it cannot determine whether a credit union it supervises, regulates or insures

---

[15] See page 67 of the Federal Financial Institution Examination Council, Bank Secrecy Act/Anti-Money Laundering Examination Manual.

has a program to let the good actors into the monetary system and keep the bad actors out. The absence of knowledge of state cannabis regulations renders the NCUA unqualified to determine whether a program designed to monitor state licensed commercial marijuana activity is or is not comprehensive.

109. Credit unions subject to regulation by the NCUA, state credit union regulators, and federal lawmakers have requested that the NCUA provide rules, regulations or supervisory letters to clarify the general principles expressed by the DOJ and FinCEN guidance regarding credit unions providing banking services to MRBs. The NCUA has failed to provide such clarification because it has no objective criteria to share.

110. The NCUA has not set clear and achievable due diligence requirements for credit unions with marijuana business customers.

111. Upon information and belief, TFCCU presented the NCUA with the most robust compliance program related to the provision of services to MRBs the NCUA has reviewed to date. The NCUA was not equipped to assess or measure the quality of what it was reviewing in respect of TFCCU's cutting-edge approach to enhanced due diligence and know-your-customer activity and protocols relevant to prospective members of TFCCU which are MRBs. For instance, historically, AML compliance by financial institutions to 'know-their-customers' has been substantially reliant on desktop investigations in search of adverse material regarding a customer or his affairs by using public and private search engines to "run the name" of a customer for relevant material available on the Internet. Also, representations from bank or credit union customers regarding the ostensible purpose for an electronic payment from a customer's account are

collected but not frequently independently scrutinized. In contrast, TFCCU proposes to take AML compliance out from behind the desk and into the field, and to make a culture of compliance the center of the financial institution by, in part, conducting regular field audits of TFCCU's Type 1 members' licensed cannabis businesses with a 135-item checklist to seek to identify areas of non-compliance with either Colorado State or municipal cannabis licensing laws or any of the eight areas of activity prioritized by the DOJ under the Cole memorandum for federal criminal prosecution. Real-time access to each MRB members' electronic point of sale system by TFCCU's AML Compliance Unit is to be a condition of membership of all Type 1 members [namely MRBs]. Each Type 1 member will be required to deposit 100% of the proceeds of sale of cannabis into their TFCCU account so that point of sale data can be matched to deposits so as to guard against the use of Type 1 member accounts by money launderers or unregulated cannabis dealers. All payments out of Type 1 accounts will be required to be on a pre-approved vendor list approved by TFCCU's AML Compliance Unit, failing which a hold is to be placed on any non-approved payment to allow its reported purpose to be investigated by TFCCU's Compliance Unit. TFCCU's Type 1 and Type 2 members would be expected to pay for the cost of this enhanced form of AML compliance through monthly fees.

112.   12 C.F.R. §741.3(f), entitled "Letter of disapproval" states:  "A credit union whose application for share insurance is disapproved shall receive a letter stating the reasons for such disapproval, a citation of authority for such disapproval, and suggested methods by which the applying credit union may correct its deficiencies and thereby qualify for insurance."

113.    In violation of its own regulation (12 C.F.R. §741.3(f)), the NCUA Board failed to provide a letter of disapproval that stated the reasons why the NCUA Board believed TFCCU was unable to satisfy DOJ, FinCEN and BSA/AML enhanced monitoring requirements in respect of the provision of services to MRBs; it provided no citation to any authority, such as objective criteria developed by the agency; and, it provided no statement of suggested methods by which TFCCU could correct its deficiencies and thereby qualify for insurance.

114.    The NCUA's abject failure to provide a citation to any authority or suggested corrections to TFCCU's proposed enhanced AML compliance and monitoring program is evidence that the NCUA has developed no objective criteria upon which to base a decision.   It is further evidence that the NCUA lacks a fundamental understanding of Colorado's legalized marijuana industry.  Such arbitrary action cannot be disguised by the simple semantic maneuver of claiming TFCCU was unable to "satisfy federal financial monitoring requirements" or that TFCCU does "not fully understand."  Were courts to accept an unsubstantiated conclusion of an "unable to meet" burden – agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with the Administrative Procedure Act and quite likely with the Constitution as well.

115.    In its letter of July 2, 2015, the NCUA criticized TFCCU on the basis that TFCCU "has no historical data NCUA can use to make a decision in determining insurance risk." This is a wholly irrational position for the NCUA to take in the light of the fact that TFCCU is a start-up credit union.  New credit unions do not have "historical data" available to provide in support of an application to the NCUA for such insurance. Notwithstanding the absence of any historical operating performance data, two separate

A-rated U.S based insurance carriers have issued, respectively, a surety bond and a directors' and officers' liability policy to TFCCU – which remain in good standing.

116.     The Court should hold unlawful and set aside the NCUA's baseless action, finding and decision that TFCCU was unable to satisfy DOJ, FinCEN and BSA/AML enhanced monitoring requirements in respect of the provision of services to MRBs, as not supported by substantial evidence, without observance of a set of transparent procedural rules required by law, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. §706.

### FOR A THIRD CAUSE OF ACTION

(Judicial Review Under APA – 5 U.S.C. §§701 *et seq.*)

(NCUA acted arbitrarily, capriciously, not in accordance with law and abused its discretion in concluding TFCCU's business model served a single industry that does not have an established track record and remains illegal at the federal level)

117.     Plaintiff hereby repeats and realleges the foregoing allegations of the Complaint as if set forth herein verbatim.

118.     The Colorado Commissioner of DFS, in the state chartering process, approved TFCCU's field of membership and determined its business model was economically viable.  C.R.S. §§11-30-101 (1)(a), (3)(a) and (b).  The Commissioner's decision is entitled to a presumption of validity.

119.     As fully presented to the NCUA, TFCCU's business model embraced 3 distinct types of account holders – *Type 1* accounts consisting of licensed cannabis and hemp businesses; *Type 2* accounts, consisting of accounts of companies that directly or indirectly serve the industry; and *Type 3* accounts, consumer accounts and non-marijuana related business accounts; with *Type 3* accounts being the *vast majority* of prospective

accounts.   Prospective *Type 3* account holders will be drawn from the thousands of persons that believe in the social movement grounded in state's rights, personal liberty and wellness that are members of, or who chose to join, one of the multiple associations that constitute TFCCU's statutorily approved field of membership.

120.   NCUA acted arbitrarily, capriciously, not in accordance with law and abused its discretion in incorrectly concluding TFCCU'S business model served "a single industry that does not have an established track record and remains illegal at the federal level."   Rather, the sole evidence on this point is that the vast majority of TFCCU's prospective members are expected to be persons that are members of, or who join, one of the multiple organizations listed in TFCCU's field of membership that believe in the social movement grounded in state's rights, personal liberty and wellness.   These persons are not engaged in any activity that violates federal law.   Rather, these persons are exercising their constitutional right to support a social movement in which they believe.

121.   The Court should hold unlawful and set aside the NCUA's action, finding and decision that TFCCU's business model "served a single industry that does not have an established track record and remains illegal at the federal level", as not supported by substantial evidence, without observance of procedure required by law, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.   5 U.S.C. §706.

## FOR A FOURTH CAUSE OF ACTION

(Judicial Review Under APA – 5 U.S.C. §§701 *et seq.*)

(NCUA acted arbitrarily, capriciously, not in accordance with law and abused its discretion in concluding that TFCCU did not present adequate evidence of compelling interest and commitment among the members to promote thrift through systematic savings)

122.   Plaintiff hereby repeats and realleges the foregoing allegations of the Complaint as if set forth herein verbatim.

123.   The Colorado Commissioner of DFS, in the state chartering process, approved TFCCU's field of membership.  The Commissioner concluded that TFCCU's business model was economically viable and that TFCCU was a cooperative association incorporated to promote thrift.  C.R.S. §§11-30-101(1)(a), (3)(a) and (b).   The Commissioner's decision is entitled to a presumption of validity.

124.   TFCCU provided the NCUA with the same materials it provided to Colorado DFS.  The Colorado Commissioner of DFS determined that TFCCU's proposed field of membership would benefit from the establishment of TFCCU, that TFCCU was a cooperative association established for the purpose of promoting thrift, and that the business model was economically viable.  The fact that the Colorado Commissioner of DFS made these statutorily required findings during the chartering process is substantial evidence of a compelling interest or commitment among prospective members to promote thrift.  It is noteworthy that NCUA's "Form 9600 – Application of a State Chartered Credit Union for Insurance of Accounts" does not call for the submission of *any items* related to a compelling interest on the part of a credit union's field of membership – as that determination is properly vested in the Colorado Commissioner of DFS and is made by the state during the *chartering* process.  This makes sense as a local

Colorado regulator is better situated to determine economic need amongst a local group of prospective credit union members who share a common bond, than an NCUA bureaucrat sitting behind a desk in Alexandria, Virginia.

125.    Licensed cannabis businesses and *Type 2* account holders are severely *underserved* when it comes to access to banking.  A need for banking services was the underlying basis for the issuance by FinCEN of its guidance on the provision of banking services to MRBs.  This fact is generally known within this court's territorial jurisdiction and can be accurately and readily determined from state sources whose accuracy cannot reasonably be questioned, as well as from the administrative record before the NCUA.

126.    The NCUA's true concern is not whether it holds true for TFCCU that, "if you build it will they come" (*i.e.* the uncertainty of economic viability), but rather that too many MRBs might unite to accept the federal government's invitation to place the proceeds of their state-legal cannabis businesses into the federal monetary system -- a concern that is not within the scope of the NCUA's mission.[16]  The power arising from the fusion of a state-spawned industry and an unstoppable social movement into the cooperative venture of a state-chartered credit union – is the NCUA's true concern – *not* the success of the venture.  TFCCU is too timely to fail because, in the words of Bob Dylan, "the times they are a-changin."[17]

127.    The NCUA acted arbitrarily, capriciously, not in accordance with law and abused its discretion in concluding that TFCCU did not present adequate evidence of

---

[16]  "The mission of the NCUA is to provide, through regulation and supervision, a safe and sound credit union system, which promotes confidence in the national system of cooperative credit."
http://www.ncua.gov/about/Pages/default.aspx
[17] Dylan, Bob, *The Times They Are A-Changin'* (Sony Music Entertainment/Columbia Records 1964).

compelling interest and commitment among its prospective field of membership to promote thrift through systematic savings.

128.    The NCUA acted arbitrarily, capriciously, not in accordance with law and abused its discretion in failing to include in its July 2, 2015 letter of disapproval to TFCCU "suggested methods by which the applying credit union may correct its deficiencies and thereby qualify for insurance." 12 C.F.R. §741.3(f).

129.    The Court should hold unlawful and set aside the NCUA's action, finding and decision that TFCCU did not present adequate evidence of compelling interest and commitment among its prospective field of membership to promote thrift through systematic savings, as not supported by substantial evidence, without observance of procedure required by law, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. §706.

## FOR A FIFTH CAUSE OF ACTION

(Judicial Review Under APA – 5 U.S.C. §§701 *et seq.*)

(NCUA acted arbitrarily, capriciously, not in accordance with law and
abused its discretion in concluding TFCCU failed to provide information
on the general character and fitness of the credit union's management)

130.    Plaintiff hereby repeats and realleges the foregoing allegations of the Complaint as if set forth herein verbatim.

131.    The Colorado Commissioner of DFS, in the state chartering process, is statutorily vested with the authority to *approve* the general character and fitness of the incorporators of TFCCU, whether the incorporators and organizers were qualified, and whether their qualifications and financial experience were consistent with their responsibilities and duties. C.R.S. §§11-30-101(1)(a), (3)(a) and (b).  It was determined

by DFS that the incorporators and officers were qualified. This determination was based, in part, on background checks performed by the Colorado Bureau of Investigations on behalf of DFS on each of TFCCU's proposed incorporators and directors. Further, the Governor submitted a letter to the NCUA attesting to the fact TFCCU had "a talented board consisting of well-respected government, non-profit and business leaders." Colorado is better situated to determine the qualifications of its citizens than an NCUA bureaucrat sitting behind a desk in Alexandria, Virginia.

132. TFCCU committed to provide the NCUA with a Form 4012 Report of Official and Agreement to Serve once actual employees were hired and the NCUA agreed TFCCU could provide this information on a "flow basis." The NCUA knew that TFCCU is a start-up credit union and does not yet have a full management team in place to vet. This notwithstanding, detailed biographical data on each incorporator and board member of TFCCU was provided to DFS and, through the provision of a copy of its application for a Charter from Colorado, to the NCUA.

133. The NCUA acted arbitrarily, capriciously, not in accordance with law and abused its discretion in failing to include in its letter of disapproval to TFCCU "suggested methods by which the applying credit union may correct its deficiencies and thereby qualify for insurance." 12 C.F.R. §741.3(f).

134. The Court should hold unlawful and set aside the NCUA's action, finding and decision that TFCCU did not present adequate evidence of the character and fitness of TFCCU's management as not supported by substantial evidence, without observance of procedure required by law, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. §706.

## FOR A SIXTH CAUSE OF ACTION

(Judicial Review Under APA – 5 U.S.C. §§701 *et seq.*)

(NCUA acted arbitrarily, capriciously, not in accordance with law and abused its discretion in rejecting the business plan that was approved by the Commissioner of DFS)

135.    Plaintiff hereby repeats and realleges the foregoing allegations of the Complaint as if set forth herein verbatim.

136.    The Colorado Commissioner of DFS, in the state chartering process, is vested with the statutory authority to determine the economic viability of a proposed credit union.  C.R.S. §§11-30-101 (1)(a), (3)(a) and (b).  It was determined that TFCCU had an economically viable business plan.

137.    The business plan was refined in collaboration with Colorado DFS over several months, before it was ultimately approved.  The Commissioner's decision is entitled to a presumption of validity.

138.    TFCCU provided the same information about its business plan to the NCUA that it provided to the Commissioner of Colorado's DFS.

139.    TFCCU *also* produced the abbreviated business plan required by the NCUA "Form 9600 – Application of a State Chartered Credit Union for Insurance of Accounts."  The NCUA Form 9600, question 9, requires production of "the Balance Sheet and Statement of Income and Expense . . . "

140.    TFCCU *did in fact* provide the NCUA with sufficient documentation for it to assess the feasibility of TFCCU's business plan.

141.    The NCUA's July 2, 2015 letter of disapproval reflects the fact that the NCUA did not comprehend (or chose to ignore) the fact that TFCCU's business model

embraced 3 types of account holders – *Type 1* accounts consisting of licensed cannabis and hemp businesses; *Type 2* accounts, consisting of accounts of companies that directly or indirectly serve the industry; and *Type 3* accounts, consumer accounts and non-marijuana related business accounts; with *Type 3* accounts representing the *vast majority* of prospective member accounts.   Prospective *Type 3* account holders are expected to be drawn from the thousands of persons that believe in the social movement grounded in state's rights, personal liberty and wellness that are members of (or who choose to join) one of the multiple associations that constitute TFCCU's statutorily approved field of membership.  Their support of the industry is not federally illegal.

142.   The NCUA's incorrect conclusion that TFCCU "served a single industry" rendered the NCUA incapable of accurately assessing the risk presented by what was, in fact, TFCCU's multi-faceted, diverse business plan that did not concentrate risk by *only* serving licensed cannabis businesses.

143.   The NCUA's finding that TFCCU's business model serves a "single industry that does not have an established track record of success" is not supported by substantial evidence and is patently wrong.  TFCCU was chartered by Colorado to serve licensed cannabis and hemp businesses, and its thousands of supporters that are members of, or who join, one of the multiple associations within TFCCU's field of membership. The relevant data shows that the state legalized cannabis industry is "the fastest growing industry in the U.S."  *Huffington Post* (1/26/15).  "The marijuana industry could be bigger than the NFL by 2020" – $35 billion estimated. *Washington Post* (10/24/14).  The relevant data shows that state licensed cannabis and hemp businesses, and the ancillary businesses that support them, are severely underserved when it comes to gaining access

to financial services.  Historically, credit unions proliferated to "provide services to those would-be customers that banks disdained."  *First Nat'l Bank & Trust Co. v. Nat'l Credit Union Administration*, 988 F.2d 1272, 1275-76 (D.C.Cir. 1993).  The NCUA failed to comprehend TFCCU's direct connection to the fast growing social movement grounded in personal liberty, state's rights and wellness.  This social movement was supported by 1,383,139 Colorado voters representing 55.32% of the electorate that voted in favor of legalization.  As of February 6, 2015, there are 926 marijuana business licenses in the Denver Metro area alone.  It is this common bond that is the cement that unites TFCCU credit union members in this cooperative venture.  It is this common bond that is the foundation for the credit union's anticipated success.

144.   NCUA acted arbitrarily, capriciously, not in accordance with law and abused its discretion in failing to include in its July 2, 2015 letter of disapproval to TFCCU "suggested methods by which the applying credit union may correct its deficiencies and thereby qualify for insurance."  12 C.F.R. §741.3(f).

145.   The Court should hold unlawful and set aside the NCUA's action, finding and decision that TFCCU failed to provide sufficient documentation of the feasibility of TFCCU's business plan, as not supported by substantial evidence, without observance of procedure required by law, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. §706.

### FOR A SEVENTH CAUSE OF ACTION
(Judicial Review Under APA – 5 U.S.C. §§701 *et seq.*)

(NCUA acted arbitrarily, capriciously, not in accordance with law and abused its discretion in finding that TFCCU did not provide copies of necessary policies or procedures to evaluate management's commitment to establishing sound internal controls)

146.    Plaintiff hereby repeats and realleges the foregoing allegations of the Complaint as if set forth herein verbatim.

147.    Question 21 of "NCUA Form 9600 – Information to be Provided in Support of an Application of a State Chartered Credit Union for Insurance of Accounts" asks specific questions about "Lending Policies and Practices".  TFCCU completed this section in full and attached Schedule No. 7.

148.    Nowhere in the Form 9600 does it state a credit union applying for insurance must provide copies of all of its formal written policies in order for its application to be processed.  Notwithstanding this, TFCCU agreed to provide this information.  Certainly, these policies need to be in place before loan programs are launched.

149.    At the time of application, TFCCU provided the NCUA with all information the NCUA application form indicated was necessary.  TFCCU promised to provide the NCUA with its formal written loan policy documents at a later date (prior to opening).  At the time of application, TFCCU provided the NCUA with all information the NCUA's application form indicated was necessary.  The NCUA had this information for 2 ½ months before claiming it was incomplete – the day after TFCCU obtained its unconditional charter from Colorado, November 19, 2014.

150.    The NCUA acted arbitrarily, capriciously, not in accordance with law and abused its discretion in failing to include in its letter of disapproval to TFCCU of July 2, 2015, "suggested methods by which the applying credit union may correct its deficiencies and thereby qualify for insurance."  12 C.F.R. §741.3(f).

151.    The Court should hold unlawful and set aside the NCUA's action, finding and decision that TFCCU failed to provide sufficient documentation of its formal written loan policy documents, as not supported by substantial evidence, without observance of procedure required by law, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. §706.

## FOR AN EIGHTH CAUSE OF ACTION

(Judicial Review Under APA – 5 U.S.C. §§701 *et seq.*)

(NCUA acted arbitrarily, capriciously, not in accordance with law and abused its discretion in discriminating against TFCCU, a state chartered credit union, and acting in favor of federally chartered and federally insured credit unions in violation of 12 U.S.C. §1790)

152.    Plaintiff hereby repeats and realleges the foregoing allegations of the Complaint as if set forth herein verbatim.

153.    The NCUA applies, in part, the FinCEN guidance and the Cole Memorandum in determining whether federally chartered and federally insured credit unions may provide banking or financial services to MRBs.

154.    All federally chartered and federally insured credit unions are permitted to serve MRBs and obtain, or continue in effect, their federal share deposit insurance.

155.    12 U.S.C. §1790, entitled "Nondiscriminatory provision" states:  "It is not the purpose of this subchapter (Subchapter II – Share Insurance) to discriminate in any manner against State-chartered credit unions in favor of Federal credit unions, but it is the purpose of this subchapter to provide all credit unions with the same opportunity to obtain and enjoy the benefits of this subchapter."

156.    The NCUA did not give TFCCU the same opportunity to obtain and enjoy the benefits of federal share deposit insurance (while serving MRBs) that the NCUA has

provided to *all* other federally insured credit unions which choose to serve MRBs.  The NCUA has acted in an anti-competitive and discriminatory manner by acting to block a new, innovative state chartered credit union from participating in the financial system – an action wholly at odds with the NCUA's stated mission of helping new credit unions thrive.

157.    The NCUA must establish objective standards and apply those standards to *all* federally insured credit unions in determining whether TFCCU can serve MRBs – and be federally insured.

158.    The NCUA acted arbitrarily, capriciously, not in accordance with law and abused its discretion in discriminating against TFCCU, a state-chartered credit union, and acted in favor of federally chartered and federally insured credit unions in violation of 12 U.S.C. §1790, by refusing to allow TFCCU to obtain share deposit insurance to provide services to MRBs while *all* NCUA federally chartered and insured credit union are specifically permitted by the NCUA to serve MRBs - while continuing the insurability of accounts pursuant to Title II of the Act, 12 C.F.R. §741.3.

159.    The Court should hold unlawful and set aside the NCUA's action, finding and decision that TFCCU's application for share deposit insurance should be denied, as discriminatory, not supported by substantial evidence, without observance of procedure required by law, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. §706.

## FOR A NINTH CAUSE OF ACTION

(Judicial Review Under APA – 5 U.S.C. §§701 *et seq.*)

(NCUA acted arbitrarily, capriciously, not in accordance with law and abused its discretion in applying net worth requirements to TFCCU, a new credit union, in violation of 12 U.S.C. §1790d)

160.    Plaintiff hereby repeats and realleges the foregoing allegations of the Complaint as if set forth herein verbatim.

161.    The NCUA is required by law to recognize that credit unions (as cooperatives that do not issue capital stock) initially have *no net worth*. Also, the NCUA is required by law to give credit unions a reasonable time to accumulate net worth. 12 U.S.C. §1790d(b)(1)(B).

162.    New credit unions have 10 years to become adequately capitalized. *Id.*

163.    A credit union is adequately capitalized if it has a net worth ratio of not less than 6 percent.  12 U.S.C. §1790d(2)(B)(c)(1)(B).

164.    The NCUA disregarded the law that allows a new credit union 10 years in which to become adequately capitalized by requiring that TFCCU present evidence of some undefined amount of capital at startup and following the first two years of operations.

165.    The NCUA acted arbitrarily, capriciously, not in accordance with law and abused its discretion in illegally applying ill-defined, non-transparent and arbitrary net worth requirements to TFCCU, a new credit union, in violation of 12 U.S.C. §1790d - which provides that new credit unions initially have no net worth and are entitled to reasonable time to accumulate net worth.

166.    The Court should hold unlawful and set aside the NCUA's action, finding and conclusion that TFCCU is required to have a net worth at start-up and following the first two years of operations in violation of 12 U.S.C. §1790d, as not supported by substantial evidence, without observance of procedure required by law, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. §706.

## FOR A TENTH CAUSE OF ACTION

(Judicial Review Under APA – 5 U.S.C. §§701 *et seq.*)

(NCUA acted arbitrarily, capriciously, not in accordance with law and abused its discretion in interpreting 12 U.S.C. §1781(c) as requiring a new credit union seeking share deposit insurance as being required to provide "historical data NCUA can use to make a decision determining insurance risk")

167.    Plaintiff hereby repeats and realleges the foregoing allegations of the Complaint as if set forth herein verbatim.

168.    The NCUA stated that in reviewing TFCCUs application for insurance of accounts, TFCCU's application presented a challenge for the NCUA because TFCCU did not have "historical data NCUA can use to make a decision determining insurance risk."

169.    A new credit union would never have historical data the NCUA could use to make a decision determining insurance risk.

170.    New state-chartered credit unions are entitled to receive federal share deposit insurance.

171.    The fact that a credit union is new is not a basis for NCUA to disapprove a federal share insurance application.

172.    12 U.S.C. §1781(c)(A) provides that before approving the application of any credit union for insurance of its member accounts, the Board "shall consider -- (A) the history, financial condition, and management policies of the applicant."

173.    In some instances an existing credit union (as opposed to a new credit union) "converts to insurance coverage with the NCUSIF."  12 C.F.R. §741.4(i).  In such case, an applicant would have an operating history.   In other instances, a new credit union could begin to operate *before* it has been granted insurance, and it would have a history.  12 U.S.C. §1781(b).   This is borne out by the fact that a new credit union is entitled to a master account at the Federal Reserve if it is "eligible to make application to become insured" and by the fact that it can apply to become insured "at any time."  *Id.* 12 U.S.C. §461(b)(1)(A).   The law provides that the NCUA can examine "any credit union making application for insurance of member accounts . . . to determine the condition of any such credit union for insurance purposes."   12 U.S.C. §1784.   An examination of a credit union could not take place unless that credit union is *open* for business.  The reason the law is structured in this way is so a credit union may commence operations, establish deposits in its master account at the Federal Reserve and then apply for share deposit insurance "at any time" with some historical data.  By operating before its insurance is formally approved, a new credit union could definitively show that – "if you build it will they come."  Also, management can affirmatively demonstrate its fitness to operate.   This is why Colorado state law allows a credit union to receive an unconditional charter after it has "applied for" federal share deposit insurance (not after it has received it).   C.R.S. §11-30-117.5(3).   Because the NCUA and FRB-KC secretly conspired to deny TFCCU access to a master account in their improper *ex parte*

communications conducted while the NCUA was engaged in the informal adjudication of TFCCU's confidential application, TFCCU has been unfairly deprived of the opportunity to establish a history of deposits while its federal share deposit insurance application was being processed. NCUA's unlawful sharing of TFCCU's confidential insurance application information with FRB-KC (an independent Reserve Bank owned by large commercial member banks that are putative competitors of TFCCU) invalidates the NCUA's adverse determination of TFCCU's application.

174.   The NCUA acted arbitrarily, capriciously, not in accordance with law and abused its discretion in interpreting 12 U.S.C. §1781(c)(A) as requiring a new credit union to provide historical information, and in conspiring by way of improper *ex parte* communications with FRB-KC to prevent TFCCU from establishing a history of deposits by illegally blocking TFCCU's ability to obtain a master account.

175.   The Court should hold unlawful and set aside the NCUA's action, finding and decision that TFCCU, a new credit union, is required to provide historical information, as not supported by substantial evidence, without observance of procedure required by law, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. §706.

## FOR AN ELEVENTH CAUSE OF ACTION

(Judicial Review Under APA – 5 U.S.C. §§701 *et seq.*)

(NCUA acted arbitrarily, capriciously, not in accordance with law and abused its discretion in engaging in improper *ex parte* communications relative to TFCCU's pending confidential federal share insurance application)

176.   Plaintiff hereby repeats and realleges the foregoing allegations of the Complaint as if set forth herein verbatim.

177.     The NCUA is an independent federal agency. 12 U.S.C. §1752a.

178.     The NCUA engaged in an informal adjudication of TFCCU's federal share insurance application.  The application process is confidential.

179.     Upon information and belief, the NCUA Board and its decisional employees engaged in material oral or written communications with FRB-KC and others relevant to the merits of TFCCU's federal share deposit insurance application, an adjudicatory proceeding, that was neither on the record nor on reasonable prior notice; and, the same constituted an improper *ex parte* communication.

180.     Upon the occurrence of the said *ex parte* communications, the NCUA Board and/or its decisional employees failed to cause the *ex parte* communications to be placed on the record of the proceeding and served on all parties.

181.      The NCUA unlawfully shared TFCCU's confidential information with FRB-KC.   NCUA's unlawful sharing of confidential information with FRB-KC (an independent Reserve Bank owned by large commercial member banks that are putative competitors of TFCCU) invalidates the NCUA's adverse determination of TFCCU's application.

182.     The NCUA should be subject to an adverse ruling on the issue that is the subject of the prohibited communication.  The court should order the NCUA to provide federal share deposit insurance to TFCCU.

183.     The NCUA acted arbitrarily, capriciously, not in accordance with law and abused its discretion by engaging in improper *ex parte* communications and by unlawfully sharing TFCCU's confidential information with its competitors.

184.    The Court should hold unlawful and set aside the NCUA's action, finding and decision that TFCCU is not entitled to federal share deposit insurance because its decisional employees engaged in improper *ex parte* communications and unlawfully shared TFCCU's confidential information with FRB-KC, as not supported by substantial evidence, without observance of procedure required by law, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and it should order the NCUA to provide TFCCU with federal share deposit insurance.  5 U.S.C. §706(2)(A).

## FOR A TWELFTH CAUSE OF ACTION

(Judicial Review Under APA – 5 U.S.C. §§701 *et seq.*)

(NCUA acted arbitrarily, capriciously, not in accordance with law and abused its discretion in that the mind of its decisional employee was irrevocably closed on the matters at issue)

185.    Plaintiff hereby repeats and realleges the foregoing allegations of the Complaint as if set forth herein verbatim.

186.    TFCCU is entitled to a decision maker that acts with genuine evenhandedness, compelled by a firm and continuous desire to render to everyone that which is his or her due, and to shun any conduct tending to undermine faith and confidence in the decision making process or the office in which he or she acts.

187.    In this case, the decision maker's mind was irrevocably closed to the matters at issue, the decision maker engaged in improper *ex parte* communications and unlawfully provided TFCCU's confidential information to FRB-KC.

188.    On May 23, 2014, *before* the Director of the NCUA Office of Consumer Protection had commenced its informal adjudication of TFCCU's application for private share deposit insurance, Director Laster, the decisional employee at issue, stated "it

seems that a cannabis industry credit union may pose undue risks to the National Credit Union Share Insurance Fund ("NCUSIF") and a share insurance application may be declined for that reason."

189.    Starting from this perspective, upon review of TFCCU's federal share insurance application, the decisional employee then proceeded to reach the exact conclusion she predicted before having reviewed TFCCU's application.  The decision maker's mind was irrevocably closed to the matters at issue. This deprived TFCCU of the right to an impartial and fair hearing.  The closed mind of the decisional employee, the improper *ex parte* communications and the unlawful sharing of TFCCU's confidential insurance application information infected the entire process – a process that violated TFCCU's right to due process under the Fifth Amendment.

190.    The NCUA acted arbitrarily, capriciously, not in accordance with law and abused its discretion in that the mind of its decisional employee was irrevocably closed on the matters at issue.

191.    The Court should hold unlawful and set aside the NCUA's action, finding and decision that TFCCU is not entitled to federal share deposit insurance because the mind of its decisional employee was irrevocably closed to the matters at issue, as contrary to constitutional right, not supported by substantial evidence, without observance of procedure required by law, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and the Court should order the NCUA to grant TFCCU's application for federal share deposit insurance.  5 U.S.C. §706.

## FOR A THIRTEENTH CAUSE OF ACTION

(Judicial Review Under APA – 5 U.S.C. §§701 *et seq.*)

(NCUA acted arbitrarily, capriciously, not in accordance with law and abused its discretion in failing to follow the provisions of its August 13, 2014 supervisory letter regarding the ability of credit unions to provide services to MRBs)

192.    Plaintiff hereby repeats and realleges the foregoing allegations of the

Complaint as if set forth herein verbatim.

193.    On August 13, 2013, the Board of Governors of the Federal Reserve

System, Federal Deposit Insurance Corporation, NCUA and Office of the Comptroller of

the Currency (the "Agencies") issued a federal policy statement that the Agencies had

formally incorporated the FinCEN guidance on "BSA Expectations Regarding

Marijuana-Related Businesses" ("FinCEN Guidance") into their supervisory process.

The Agencies articulated the federal policy related to banking MRBs as follows:

> … generally, the decision to open, close or decline a particular account or relationship is made by a bank or credit union, without involvement by its supervisor.   This decision may be based on the bank or credit union's particular business objectives, its evaluation of the risks associated with offering particular products or services, and its capacity to effectively manage those risks.

194.    The NCUA acted arbitrarily, capriciously, not in accordance with law and

abused its discretion by failing to follow the terms of its August 13, 2014 supervisory

letter regarding the provision of banking or financial services to MRBs which stated that

a credit union's decision to open an account relationship, or not, with an MRB, should be

based on the credit union's evaluation of the risks associated with helping that industry

and the credit union's capacity and systems available to effectively manage the risks – the

plain meaning of which is that federally insured credit unions are permitted to provide services to MRBs.

195.    The Court should hold unlawful and set aside the NCUA's action, finding and decision that TFCCU is not entitled to federal share deposit insurance because the NCUA failed to follow its own policy as enunciated in the August 13, 2014 supervisory letter, as not supported by substantial evidence, without observance of procedure required by law, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. §706.

### FOR A FOURTEENTH CAUSE OF ACTION

(Judicial Review Under APA – 5 U.S.C. §§701 *et seq.*)

(NCUA acted arbitrarily, capriciously, not in accordance with law and abused its discretion in failing to follow the provisions of its July 18, 2014 supervisory letter regarding the ability of credit unions to provide services to MRBs in acting on TFCC's federal share deposit insurance application)

196.    Plaintiff hereby repeats and realleges the foregoing allegations of the Complaint as if set forth herein verbatim.

197.    On July 18, 2014, in a letter to the State of Washington Department of Financial Institutions, NCUA Office of Examination and Insurance Director, Larry Fazio, stated the policy of the NCUA relative to the legal ability of federally chartered and federally insured state chartered credit unions to provide services to marijuana-related businesses.  Mr. Fazio stated:  "NCUA has provided the FinCEN guidance to agency examiners, who are responsible for determining the compliance of financial institutions that provide service to marijuana-related businesses."  The clear intent of this letter is that federally insured credit unions are permitted to provide services to MRB if they complied with the FinCEN guidance.

198.    The NCUA acted arbitrarily, capriciously, not in accordance with law and abused its discretion by failing to follow the provisions of its July 18, 2014 supervisory letter regarding the provision of services to MRBs which stated that a credit union could provide services to MRBs if it complied with the FinCEN guidance, in determining TFCCU's application for federal share deposit insurance.

199.    The Court should hold unlawful and set aside the NCUA's action, finding and decision that TFCCU is not entitled to federal share deposit insurance because the NCUA failed to follow its own policy enunciated in the July 18, 2014 supervisory letter, as not supported by substantial evidence, without observance of procedure required by law, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. §706.

## FOR A FIFTEENTH CAUSE OF ACTION

(Judicial Review Under APA – 5 U.S.C. §§701 *et seq.*)

(NCUA acted arbitrarily, capriciously, not in accordance with law and abused its discretion in finding the provision of services by TFCCU to MRBs involved an undue risk to the federal share insurance fund)

200.    Plaintiff hereby repeats and realleges the foregoing allegations of the Complaint as if set forth herein verbatim.

201.    The NCUA's policy (as stated in the July 18, 2014 and August 13, 2014 supervisory letters) is to permit *all* federally insured credit unions to provide services to MRB's, provided they comply with the FinCEN guidance.

202.    Nearly 400 financial institutions (some of which were federally insured credit unions) filed 3,157 marijuana-related suspicious activity reports in at least 42 states and the District of Columbia between February 14, 2014 and January 26, 2015.

203.    On June 27, 2014, the Federal Deposit Insurance Corporation ("FDIC"), the provider of federal deposit insurance to banks, formally adopted the FinCEN guidance and authorized federally insured banks to provide services to MRBs consistent with the FinCEN guidance.  Necessarily, a federal determination was made (*albeit* in the form of "guidance") that the provision of banking services to MRBs by *all* depository institutions does not present an undue risk to the FDIC, or that the public safety risk presented by massive amounts of cash on the streets outweighs any risk to the FDIC.[18]

204.    On July 18 and August 13, 2014, the NCUA formally adopted the FinCEN guidance and authorized *all* federally insured credit unions to provide services to MRBs consistent with the FinCEN guidance.  Necessarily, a federal determination was made (*albeit* in the form of "guidance") that the provision of financial services to MRBs by *all* credit unions did not present an undue risk to the NCUSIF; or that the public safety risk presented by massive amounts of cash on the streets outweighed any risk to the NCUSIF. Generally, the deposit of funds strengthens a financial institution, rather than weakens it.

205.    The FDIC and NCUSIF deposit insurance programs cover an account holder that loses up to $250,000 of his or her funds (per account) due to the *insolvency* of a depository institution.  Neither the FDIC or the NCUSIF would reimburse an account holder any portion of their lost funds as a result of civil or criminal asset forfeiture. Thus, it makes sense that the FDIC and NCUSIF have adopted the FinCEN guidance that seeks to facilitate the deposit of money from state legal cannabis businesses deposited into any depository institution that has in place enhanced due diligence and monitoring protocols.   In fact, serving MRBs under a compliant business plan could provide much

---

[18] Generally, the deposit of funds strengthens a financial institution, rather than weakens it.

needed income to small credit unions and community banks – who as a result of the income gained from serving MRBs will bolster their balance sheets and thereby present *less* risk of insolvency to the FDIC and NCUSIF – rather than undue risk.

206.    Two A+ rated U.S. based insurance carriers determined TFCCU did not present an undue risk.  They issued fidelity (or surety) bond coverage and directors & officers liability coverage to TFCCU.  Statistically, the risk of a fidelity loss is far greater than the risk of credit union failure.  Historically, less than 1% of new credit unions become insolvent.  The existence of adequate fidelity bond coverage is a factor that alleviates undue risk.  12 C.F.R. §741.3(d).

207.    The term "undue risk to the NCUSIF" is defined as:

> a condition which creates a probability of loss in excess of that normally found in a credit union and which indicates a reasonably foreseeable probability of the credit union becoming insolvent because of such condition, with a resultant claim against the NCUSIF.  12 C.F.R. §741.3 (d).

208.    The NCUA failed to examine the relevant data and did not articulate a rational connection between TFCCU's business model and its conclusion that said business model creates an undue risk to the NCUSIF.  The NCUA did not articulate how TFCCU's multiple association, largely AML compliance fee-based, business model creates an undue risk to the NCUSIF.

209.    The NCUA's finding that TFCCU's business model serves a "single industry that does not have an established track record of success" is not supported by substantial evidence and is patently incorrect.  TFCCU was chartered by Colorado to serve licensed cannabis and hemp businesses, and its thousands of supporters that are members of, or who join, one of the multiple associations within TFCCU's field of

membership.   The relevant data is the state legalized cannabis industry is "the fastest growing industry in the U.S."  *Huffington Post* (1/26/15).  "The marijuana industry could be bigger than the NFL by 2020" – $35 billion estimated.  *Washington Post* (10/24/14). The relevant data is that state licensed cannabis and hemp businesses, and ancillary businesses that support them, are severely underserved.   Historically, credit unions proliferated to "provide services to those would-be customers that banks disdained." *First Nat'l Bank & Trust Co. v. Nat'l Credit Union Administration*, 988 F.2d 1272, 1275-76 (D.C.Cir. 1993).   The NCUA failed to comprehend TFCCU's direct connection to the fast growing social movement grounded in personal liberty, state's rights and wellness.   It is this common bond that is the cement that unites TFCCU credit union members in this cooperative venture.   It is this common bond that is the foundation for the credit union's anticipated success.

210.    The Commissioner of Colorado's DFS, as required by law, determined that TFCCU's business plan was economically viable. C.R.S. §§11-30-101(1)(a), (3)(a) and (b).  The Commissioner's decision is entitled to a presumption of validity.

211.    TFCCU's lending and investment policies are governed by state law and regulations that precisely mandate conservative practices for the protection of the public, thus mitigating risk from the two main aspects of every state chartered credit union's primary business activity – that being, lending and investment. C.R.S. §11-30-104(e).  By state law, investments are limited to government guaranteed or backed obligations or securities.   *Id.*  Lending policies are subject to rules and regulations promulgated by Colorado's DFS, and compliance with those rules is under the supervision of the Commissioner.  C.R.S.  §11-30-106(1) (a) and (3).

212.    In determining whether a credit union's financial condition and lending policies are both safe and sound, the NCUA is required to examine relevant data and articulate a rational connection between the facts found and the decision.  The factors for determining whether a credit union's polices are both safe and sound are: (1) the existence of unfavorable trends which may include excessive losses on loans; (2) the existence of written lending policies; (3) investment policies which are within the provisions of applicable law and regulation; and, (4) the existence of written interest rate policies.  12 C.F.R. §741.3(b).  TFCCU has no unfavorable trends or losses on loans; its lending policies are governed by state law and outlined at Page 6 and Schedule 7 of the NCUA "Form 9600, Information to be Provided in Support of the Application of a State Chartered Credit Union for Insurance of Accounts;" and its interest rate policy is the model set forth in Appendix B to Part 741, which represents widely accepted best practices in the management of interest rate risk for the benefit of all federally insured credit unions.  When the relevant factors are applied to TFCCU, its policies are safe and sound.

213.    Underlying the NCUA's conclusion of undue risk is the NCUA's irrational assumption that Colorado regulators (without NCUA oversight) will *not* do their job in adequately supervising and regulating TFCCU.

214.    The NCUA acted arbitrarily, capriciously, not in accordance with law and abused its discretion in finding the provision of services by TFCCU to its field of membership involved an undue risk to the federal share insurance fund.

215.    The Court should hold unlawful and set aside the NCUA's action, finding and decision that TFCCU presents an undue risk to the federal share insurance fund as

not supported by substantial evidence, without observance of procedure required by law,

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5

U.S.C. §706.

## FOR A SIXTEENTH CAUSE OF ACTION

(Judicial Review Under APA – 5 U.S.C. §§701 *et seq.*)

(NCUA acted arbitrarily, capriciously, not in accordance with law and abused its discretion, and acted contrary to constitutional power in failing to accord any  weight to the decision of Colorado's DFS Commissioner to issue TFCCU a charter)

216.    Plaintiff hereby repeats and realleges the foregoing allegations of the

Complaint as if set forth herein verbatim.

217.    The power to charter a credit union is reserved to the States under the

Tenth Amendment.  U.S. CONST. amend X.  This reservation of power creates a bedrock

of state sovereignty upon which the federal government cannot impinge.

218.    The NCUA has unduly trammeled the prerogatives of the State of

Colorado under the Tenth Amendment by disregarding the findings and conclusions

reached by the Colorado Commissioner of DFS that gave rise to the issuance of an

unconditional state credit union charter to TFCCU.  This discriminatory action is an

improper federal intervention into traditional state turf; namely, a state's ability to charter

a credit union.

219.    The power of Congress to override state sovereignty is limited.

220.    Congress expressed a clear intent *not* to preempt state law that permits

states to charter credit unions.   It forbids the NCUA from discriminating "in any manner

against State-chartered credit unions" and it requires the NCUA to "provide all credit

unions the same opportunity to enjoy the benefits" of federal share deposit insurance.  12 U.S.C. §1790.

221.    There has been both implicit and explicit congressional endorsement of the dual system of federally and state-chartered credit unions coexisting in a competitive regulatory framework.  Congress has assiduously maintained competitive parity between the national and state banking systems.

222.    States have a strong interest in the activities and operations of depository institutions doing business within their jurisdictions.   In particular, States have a legitimate interest in protecting the rights of their consumers, businesses, and communities.

223.    The State of Colorado has exercised its police powers, first analyzing TFCCU's application for a charter, and then by chartering TFCCU as a solution to the urgent public safety problem presented by Colorado's nearly all cash, regulated cannabis industry.

224.    The NCUA's denial of TFCCU's application for federal share deposit insurance is an unauthorized and unjustifiable invasion of state's rights; it weakens the States of Colorado's authority to protect the interests of its consumers, businesses, and communities; and it violates the Tenth Amendment.

225.    Courts generally use a rule of construction that avoids finding a conflict between Federal and State law where possible.

226.    The NCUA acted unlawfully and contrary to constitutional right or power by failing to adhere to fundamental federalism principles by taking action that has a substantial direct negative effect on the states, on the relationship between the national

government and the states and on the distribution of power and responsibilities among the various levels of government.

227.    The NCUA acted arbitrarily, capriciously, not in accordance with law and abused its discretion, and acted contrary to constitutional power in failing to accord any weight to the decision of Colorado's DFS Commissioner to issue TFCCU an unconditional charter.

228.    The Court should hold unlawful and set aside the NCUA's action, finding and conclusion that TFCCU's application for federal share deposit insurance should be denied by way of a letter of disapproval that fails to accord any weight to the statutorily required findings made by the Colorado Commissioner of DFS, as not supported by substantial evidence, without observance of procedure required by law, being in excess of constitutional right, in excess of statutory jurisdiction or limitations, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. §706.

**FOR A SEVENTEENTH CAUSE OF ACTION**

(Judicial Review Under APA – 5 U.S.C. §§701 *et seq.*)

(Declaratory Judgment – 28 U.S.C. §2201)

(Whether a federally chartered or federally insured credit union is permitted to provide services to MRBs and obtain or maintain its insurance of accounts by the NCUSIF?)

229.    Plaintiff hereby repeats and realleges the foregoing allegations of the Complaint as if set forth herein verbatim.

230.    The NCUA has stated that the continued illegality of marijuana at the federal level was a basis for the denial of TFCCU's application for federal insurance of accounts.

231.   TFCCU takes the position that the FinCEN guidance and Cole memorandum adopted by the NCUA allow the NCUA to insure new credit unions that serve MRBs, and it permits *all* credit unions that have already obtained federal share deposit insurance that have elected to serve MRBs to continue in effect such coverage.

232.   Plaintiff is informed and believes it is entitled to a declaratory judgment declaring that the FinCEN guidance and Cole memorandum adopted by the NCUA permit the NCUA to insure credit union accounts at new credit unions that propose to serve MRBs, and at all federally insured credit unions, irrespective of the fact marijuana is federally illegal.  21 U.S.C. §801 *et seq.*

## FOR AN EIGHTEENTH CAUSE OF ACTION

(Judicial Review Under APA – 5 U.S.C. §§701 *et seq.*)

(Declaratory Judgment – 28 U.S.C. §2201)

(Whether TFCCU is a depository institution eligible to make application
to become insured under the NCUSIF?)

233.   Plaintiff hereby repeats and realleges the foregoing allegations of the Complaint as if set forth herein verbatim.

234.   TFCCU is a state-chartered credit union.

235.   A state-chartered credit union is eligible to make application to become insured pursuant to 12 U.S.C. §1781.

236.   To be eligible to maintain an account at a Federal Reserve Bank, an organization must be a state chartered "depository institution" as defined in 12 U.S.C. §461(b)(1)(A).  The term "depository institution" means – "(iv) any insured credit union as defined in section 1752 of this title or ***any credit union which is eligible to make***

***application to become an insured credit union*** pursuant to section 1781 of this title." *Id.* (emphasis supplied).

237.     Plaintiff is informed and believes it is entitled to a declaratory judgment, declaring that TFCCU is a depository institution eligible to make application to become an insured credit union pursuant to 12 U.S.C. §1781.

## CONCLUSION

The NCUA does not trust highly qualified state regulators with superior local knowledge, familiarity with a state spawned industry, and their eye on the ball, to properly charter, regulate, supervise and examine TFCCU.  Thus, in order to carry out their nefarious scheme to unlawfully block TFCCU from the Federal Reserve payments system, the NCUA concocted an over-the-top denial of the federal deposit insurance application by including a series of baseless and gratuitous findings impugning the reputations and work of the multitude of highly qualified professionals that worked on TFCCU's business plan and its AML compliance model, manual and protocols.  At the same time, the NCUA impugned the reputations and actions of Colorado regulators that approved TFCCU's charter and the Colorado elected officials that supported TFCCU's effort to solve a serious public safety problem.  The NCUA added its baseless and gratuitous findings against TFCCU not only to seek to wrongly justify its decision, but also for the improper collateral purpose of leaking its findings to FRB-KC to seek to block TFCCU's application for an FRB master account, and in furtherance of an improper collateral attempt to injure TFCCU's ability to obtain private share deposit insurance (knowing that all prospective insurers require disclosure of documentation and

information pertaining to a rejection for the insurance cover sought by an applicant). The NCUA's actions should be held unlawful and be set aside.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays unto this Honorable Court, for an order and judgment as follows:

(1)    Count One:    For an order that declares that the NCUA deprived TFCCU of property without due process of law in violation of the Fifth Amendment and in violation of the NCUA's own procedures that holds unlawful and sets aside in its entirety the NCUA's July 2, 2015 letter of disapproval of TFCCU's federal share deposit insurance application, as contrary to constitutional right, not supported by substantial evidence, without observance of procedure required by law, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. §706; 28 U.S.C. §2201;

(2)    Count Two:    For an order that declares unlawful and sets aside the NCUA's action, finding and decision that TFCCU was unable to satisfy DOJ, FinCEN and BSA/AML enhanced monitoring requirements in respect of the provision of services to MRBs, as not supported by substantial evidence, without observance of procedure required by law, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. §706;

(3)    Count Three:    For an order that holds unlawful and sets aside the NCUA's action, finding and decision that TFCCU's business model "served a single industry that does not have an established track record and remains illegal at the federal level", as not supported by substantial evidence, without observance of procedure required by law,

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. §706;

(4)    <u>Count Four:</u>    For an order that holds unlawful and sets aside the NCUA's action, finding and decision that TFCCU did not present adequate evidence of compelling interest and commitment among the members to promote thrift through systematic savings, as not supported by substantial evidence, without observance of procedure required by law, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. §706;

(5)    <u>Count Five:</u>    For an order that holds unlawful and set aside the NCUA's action, finding and decision that TFCCU did not present adequate evidence of the character and fitness of TFCCU's management, as not supported by substantial evidence, without observance of procedure required by law, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. §706;

(6)    <u>Count Six:</u>    For an order that holds unlawful and sets aside the NCUA's action, finding and decision that TFCCU failed to provide sufficient documentation of the feasibility of TFCCU's business plan, as not supported by substantial evidence, without observance of procedure required by law, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. §706;

(7)    <u>Count Seven:</u>  For an order that holds unlawful and sets aside the NCUA's action, finding and decision that TFCCU failed to provide sufficient documentation of its formal written policy documents, as not supported by substantial evidence, without observance of procedure required by law, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. §706;

(8)    Count Eight:    For an order that holds unlawful and sets aside the NCUA's action, finding and decision that TFCCU's application for share deposit insurance should be denied, as discriminatory, not supported by substantial evidence, without observance of procedure required by law, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. §706;

(9)    Count Nine:    For an order that holds unlawful and sets aside the NCUA's action, finding and decision that TFCCU is required to have a net worth at start-up and following the first two years of operations in violation of 12 U.S.C. §1790d, as not supported by substantial evidence, without observance of procedure required by law, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. §706;

(10)   Count Ten:    For an order that holds unlawful and sets aside the NCUA's action, finding and decision that TFCCU, a new credit union, is required to provide historical information as not supported by substantial evidence, without observance of procedure required by law, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. §706;

(11)   Count Eleven: For an order that holds unlawful and sets aside the NCUA's action, finding and decision that TFCCU is not entitled to federal share deposit insurance because its decisional employees engaged in improper *ex parte* communications and unlawfully divulged confidential information to FRB-KC, as not supported by substantial evidence, without observance of procedure required by law, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and it should order the NCUA to provide TFCCU with federal share deposit insurance.  5 U.S.C. §706;

(12)    Count Twelve: For an order that holds unlawful and sets aside the NCUA's action, finding and decision that TFCCU is not entitled to federal share deposit insurance because the mind of its decisional employee was irrevocably closed to the matters at issue, as contrary to constitutional right, not supported by substantial evidence, without observance of procedure required by law, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and the Court should order the NCUA to grant TFCCU's application for federal share deposit insurance.  5 U.S.C. §706;

(13)    Count Thirteen: For an order that holds unlawful and sets aside the NCUA's action, finding and decision that TFCCU presents an undue risk to the federal share insurance fund, as not supported by substantial evidence, without observance of procedure required by law, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. §706;

(14)    Count Fourteen:  For an order that holds unlawful and sets aside the NCUA's action, finding and decision that TFCCU is not entitled to federal share deposit insurance because the NCUA failed to follow its own policy enunciated in the July 18, 2014 supervisory letter, as not supported by substantial evidence, without observance of procedure required by law, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. §706;

(15)    Count Fifteen:  For an order that holds unlawful and sets aside the NCUA's action, finding and decision that TFCCU presents an undue risk to the federal share insurance fund, as not supported by substantial evidence, without observance of procedure required by law, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. §706;

(16)   Count Sixteen: For an order that holds unlawful and sets aside the NCUA's action, finding and decision that TFCCU's application for federal share deposit insurance should be denied by way of a letter of disapproval that fails to accord any weight to the statutorily required findings made by the Colorado Commissioner of DFS, as being in excess of constitutional right, in excess of statutory jurisdiction or limitations, not supported by substantial evidence, without observance of procedure required by law, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. §706;

(17)   Count Seventeen:  For a declaratory judgment declaring that the FinCEN guidance and Cole memorandum adopted by the NCUA permit the NCUA to insure credit union accounts at new credit unions that propose to serve MRBs, and at federally insured credit unions, irrespective of the fact marijuana is federally illegal;

(18)   Count Eighteen:  For a declaratory judgment declaring that TFCCU is a depository institution eligible to make application to become an insured credit union pursuant to 12 U.S.C. §1781;

(19)   For an order providing for a review of the merits of this case on an expedited basis;

(20)   For attorney's fees and costs; and

(21)   For such other and further relief as this Court may deem just and proper.

Date:   July 30, 2015     Respectfully submitted,


<u>s/ Mark A. Mason</u>
**Mark A. Mason**
**Gabrielle Z. Lee**
*Counsel of Record*
THE MASON LAW FIRM, P.A.
Tidewatch Centre on Shem Creek
465 W. Coleman Boulevard, Suite 302
Mount Pleasant, South Carolina
Telephone: (843) 884-1444
FAX: (843) 884-3595
E-mail: [mark@masonlawfirm.com](mailto:mark@masonlawfirm.com)

*Counsel for Plaintiff*